[Crim. No. 14790.   Second Dist., Div. Four.   Mar. 5, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. BERNELL MILTON, Defendant and Appellant.

Donald F. Roeschke, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General and Suzanne E. Graber, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged with murder (Pen. Code, § 187). He pled not guilty and not guilty by reason of insanity. Defendant was charged with a prior felony (Pen. Code, § 487, subd. 1), and admitted the prior conviction. Pursuant to Penal Code, section 1027, two physicians examined defendant regarding his sanity. The jury found defendant

guilty of first degree murder, and defendant, while outside the presence of the jury, withdrew his plea of not guilty by reason of insanity. After the penalty phase of the trial, the penalty was fixed at imprisonment for life. Motion for new trial was denied, defendant was sentenced to state prison for life. The court revoked probation in the admitted prior conviction (case No. 332282), the sentence to run concurrently with the sentence imposed in the present case. Defendant appeals.[1]

## FACTS

Ann Magee and Mrs. Margaret Anita Milton drove home together after work. Decedent (Mrs. Milton) went into the house to see if her husband was home. She came out and talked with Mrs. Magee and reentered the house and was not seen again by Mrs. Magee. About five or ten minutes after Mrs. Magee drove away—approximately 12:45 a.m.—Mrs. Magee saw defendant crossing 4th and Western—about four or five blocks from decedent's home. Defendant told Mrs. Magee her car door was open, and asked her to come back to have a beer. Mrs. Magee said decedent told her that she (decedent) and defendant had a fight. Mrs. Magee told defendant not to argue with Margaret and defendant said he would try not to. Mrs. Magee did not notice any scratches on defendant's face. However, except for a streetlight, it was dark. Mrs. Magee testified that decedent and defendant appeared to get along well during the month, and defendant never used force on his wife.

A neighbor, Mrs. Jones, saw defendant come out of his house at 9:30 a.m., on June 21, 1967, and when he was standing three feet from her she did not notice any scratches on him.

Mrs. Queen Esther Brown, decedent's mother, and babysitter for the baby of decedent and defendant, telephoned her daughter's home between 9:30 and 10:15 a.m., on June 21 and

---

[1]Although the handwritten notice of appeal bears a notation that it was received by the clerk on January 15, 1968 (one day late) the file also contains a document showing that it had been delivered by defendant to the sheriff's deputy on January 13, 1968. In the case of persons in custody, it is the date of delivery to the custodian that controls; the notice was timely.

At the time the probation in the earlier case (332282) was revoked and sentence pronounced therein, the defendant gave an oral notice of appeal; but no written notice followed as is required by rule 31 of the the California Rules of Court. It follows that the correctness of the revocation and sentence in case No. 332282 (even if the argument made thereon had merit) is not before us and cannot be reviewed on the present appeal.

was told by decedent to bring the baby over. Mrs. Brown went to her daughter's home at 11:35 a.m., on June 21. She was parking her car and defendant tried to open her car door which was unusual. Defendant was not nervous. Defendant took the baby and said decedent went shopping with someone named Ann. Pursuant to Mrs. Brown's request, defendant took pictures of the baby and gave the film and camera to Mrs. Brown. Mrs. Brown did not notice blood or scratches on defendant's face, but she did not look closely.

Mrs. Jones saw a male friend of defendant's enter defendant's home sometime later. Defendant, the friend and the baby left about noon. Later, at about 3 p.m., she saw them stop outside the house again, look at it, and drive off.

Mr. Martin drove to defendant's house at noon and the two men drove to defendant's sister's house but she was not home. They went to the bank and returned to the sister's house and returned home. Mr. Martin left about 1:15 p.m. He did not recall a knife on the table, but the room was in disorder.

Defendant and the baby arrived at Kay Camp's house so that she could babysit. She did not notice scratches on defendant's face, or blood, nor did Mr. Martin see scratches or blood on defendant.

Mrs. Queen Esther Brown and Kay Camp kept calling decedent's home and there was no answer. Mrs. Brown went to her daughter's house, she knocked, there was no answer and she let herself in the backdoor. Mrs. Brown found decedent's unclothed body on the bed with a cord around her neck. The room looked as if someone had been tussling in it.

Sergeant Green, a police officer, noticed a shiny petroleum-based substance on decedent's legs and buttocks. A jar of vaseline-like substance, labeled O-Press Pressing Oil, was found in nearby clothing. A knife was found with a small piece of cord on it. A coroner's investigation showed decedent had been dead 18 to 24 hours prior to an examination at 11:40 a.m., on June 22. Male Sperm was found in the decedent's rectal area and the rectal area was dilated. Flesh or skin from decedent's fingernails were removed and examined and compared with scratch marks depicted in an enlarged photograph of defendant's face. The size and shape of the material from under the fingernails compared closely, but not exactly, with the size and shape of scratch marks. Dr. Noguchi testified that the material from the fingernails came from a dark complexioned person, not necessarily a Negro,

and this material resembled the skin on defendant's face, neck and hands.

Defendant's palm print was found on the electric heater from which the cord had been cut. The jar of petroleum-like substance also had a print that could have belonged to defendant.

Between 4 and 6 p.m., on June 22d, the police found defendant sitting on a bench in the bus depot reading a newspaper containing an article entitled, "Hunt Slayer of Woman, 20," which dealt with the death of defendant's wife. One of the officers, Officer Lee, asked defendant what he was doing in the bus depot. Defendant answered that he was just sitting there, that he was not going anywhere at all, and that he was just watching people. Defendant also said, "I believe I know what you want me for." Officer Lee arrested defendant, telling him that it was for suspicion of murder. The officer then gave defendant a proper *Miranda* warning, to which defendant replied that he understood and did not wish to make any statements. Defendant was searched; no bus tickets and no money were found on him.

The arresting officers turned defendant over to Officer Papageorge for booking. That officer observed scratch marks on defendant's face, and such marks were later observed by Dr. Arterberry at Central Receiving Hospital. The doctor estimated that the marks were from one to three days old.

Between 8 and 9 p.m., on June 22d, defendant was interrogated by Sergeant Green. The sergeant had given defendant another *Miranda* warning, to which he replied that he understood the warning. Sergeant Green then asked defendant whether there was something he would like to say. Defendant replied, "Well, I don't know if I should or not, but I will answer your questions. I think I need an attorney." Defendant then made several statements, to the following effect:

He said that he had gone to bars, he went to the bus stop to sit because he liked to watch the people, and he heard on the radio that his wife was dead. He said decedent had been dating other men and he admitted slapping his wife a month before. When asked by Sergeant Green how he got the scratches defendant said he had an argument with his wife a week earlier and she slapped him causing the scratches. Defendant said he never noticed the scratches on his shoulder and hands. He didn't go home when he heard of the murder because he and his wife were separated and he did not feel such action was necessary. Defendant said he didn't pick up

the baby because he was too drunk to do so. Defendant asked to see a lawyer and the conversation was then terminated.

All defense witnesses testified that defendant and his wife were getting along together.

Defendant testified in his own behalf. He claimed that, in The Moose bar, an inebriated woman approached him, he bought her a beer at her request, she asked him to go home with her, he said he wasn't interested, and she became indignant and clawed him across his face, neck and shoulders. Defendant did not subpoena the barmaid Shirley who told the woman in the bar to leave defendant alone. Defendant denied killing his wife. Defendant said he often carried the heater in his hand from room to room.

Decedent had her own checking account and defendant claimed that, with decedent's knowledge, he made out checks to himself and signed decedent's name on checks on many occasions. On cross-examination defendant denied writing decedent's name on a particular check but on surrebuttal he said he might have made out the check, but to the best of his knowledge, decedent made it out.

## I

▉ Defendant contends the evidence is insufficient to support the verdict. We do not agree. ▉ The crime of murder may be established by circumstantial evidence. (*People* v. *Reed* (1952) 38 Cal.2d 423, 431 [240 P.2d 590] ; *People* v. *Sigal* (1967) 249 Cal.App.2d 299, 307 [57 Cal.Rptr. 541].) ▉ Unless it appears that ''on no hypothesis whatsoever'' was there sufficient evidence to sustain such a verdict the appellate court will affirm the conviction. (*People* v. *Huffman* (1967) 248 Cal.App.2d 260, 262 [56 Cal.Rptr. 255].) The appellate court will not substitute its judgment for that of the trier of fact. (*People* v. *Rightnour* (1966) 243 Cal.App. 2d 663, 671 [52 Cal.Rptr. 654].)

▉ The evidence in the case at bench, though circumstantial, sufficiently supports the verdict. Defendant was found to have scratches on his face, neck and shoulders when he was arrested. The skin removed from under decedent's fingernails compared closely as to size and shape to the scratch marks on defendant's face at the time of arrest. The pigmentation of defendant's face bore a resemblance to the pigmentation in the skin removed from decedent's fingernails.

Further, there were major inconsistencies in defendant's story. Defendant told Sergeant Green and Sergeant Steele

that he received the scratches on his face from his wife during an argument a week prior to her death, and that he never noticed the scratches on his shoulders and hands. At the trial defendant claimed he had gotten the scratches from an inebriated woman in a bar.

Defendant also told Sergeants Green and Steele that he went to his wife's house at 8:30 or 7 a.m. on June 21 to pick up some clothes, but at the trial he denied going home before Mrs. Brown's arrival. Mrs. Brown, however, testified she spoke to defendant, as well as decedent, by telephone that morning. Defendant also testified that he did not remember telling the officers he went to the house to pick up clothes; he testified he went to get the baby.

Mrs. Brown testified that defendant told her decedent went shopping with someone named Ann, but on the stand defendant said he told Mrs. Brown that decedent probably went shopping with Betty Powell.

█ Falsehoods as to material facts produce an inference of consciousness of guilt and constitute an implied admission. (*People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 397] ; see also *People* v. *Limon* (1967) 252 Cal.App.2d 575, 579 [60 Cal.Rptr. 448].) █ Some of the inconsistencies, especially in regard to the scratches on defendant's face, tend to show a consciousness of guilt. Other damaging evidence is found in the fact that defendant was jealous of decedent seeing other men and in the fact that defendant's thumb print was found on the jar containing the vaseline-like substance and a similar substance was found on decedent's rectum.

Defendant argues that the victim *probably* died before 1:30 p.m., on June 21, 1967, and that it would be "*almost*" impossible for defendant to have killed decedent prior to 1:30 p.m. These are all questions for the trier of fact and not to be relitigated on appeal.

## II

█ The second contention raised on appeal is as follows: Defendant asserts that the trial court erroneously refused to give defendant's requested voluntary manslaughter instruction. Defendant cites the case of *People* v. *Carmen* (1951) 36 Cal.2d 768, 773-774 [228 P.2d 281], for the well established proposition that it is reversible error to refuse a manslaughter instruction in a murder case where the evidence would warrant a conviction of manslaughter. However, in the *Carmen* case the defendant made a statement that he shot only to frighten some boys and had no intention of killing or injuring

them, which was some evidence on which a manslaughter verdict could be based. In the case at bench no evidence was presented by either the defense or prosecution that defendant killed his wife in the heat of passion; defendant's sole evidence was that he did not commit the crime at all.

In the case of *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627], the court also refused an instruction on manslaughter. The court said at page 188: "Instructions are to be given with reference to the facts before the jury. The facts unquestionably pointed to a premeditated homicide. No defense was offered by the defendant except that of alibi. It is proper to refuse to give an instruction as to a lesser degree, or as to an included lesser offense, if the evidence warrants only a verdict of first degree murder in the event the accused is guilty at all. [Citations.] There was therefore no error in the refusal to give the requested instructions or in the giving of the instruction complained of." See also *People* v. *Mandell* (1942) 48 Cal.App.2d 806, 817 [120 P.2d 921], and *People* v. *DuBois* (1936) 16 Cal.App.2d 81, 86 [60 P.2d 190].

## III

█ Defendant argues that it was reversible error to admit evidence as to the statements made by him to Sergeant Green. The argument is based on the decision in *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]. In that case, the defendant had been given the required warning and had declined to talk. The police then confronted the defendant with his two accomplices and, after they had left, again advised defendant of his rights and secured a confession. The Attorney General argues that *Fioritto* is not controlling here because: (a) the case at bench involves an admission and not a confession; (b) here Sergeant Green was (so far as we know) unaware of the earlier warning and refusal; (c) the time interval was several hours rather than the few minutes in *Fioritto*.

We do not regard these factual differences as being material. Admittedly, *Miranda* applies to admissions as well as to confessions. To say that the ignorance of the second officer concerning the earlier interview shields the second interview from attack not only would open the door to evasions by the police but it ignores the reason for the *Fioritto* rule, which is to prevent the police from wearing down a prisoner's resistance by repeated pressuring until he finally makes the statement desired in order to get peace. That pres-

sure exists whether or not the successive would-be interrogators are acting in concert for that purpose, or are acting independently—it is the effect on the prisoner that *Fioritto* seeks to avoid. Finally, without necessarily holding that two attempts at interview might not be so far apart as to refute any risk of psychological pressure, clearly two attempts within two hours of each other, on the very night of arrest, are not that far apart. As we read *Fioritto,* it is only where the prisoner initiates the subsequent interview, evidencing a change of mind not affected by any official action, that there may be an admissible conversation. No such situation was here present.

## IV

The Attorney General argues that, if error, the admission of the admissions to Sergeant Green was not prejudicial. Since a violation of a federal constitutional right was involved, the test of prejudice is that of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. As we have pointed out above, the case against defendant is purely circumstantial. The fact that his prints were found on articles in his own home is not highly significant; two witnesses who saw defendant after the time when death must have occurred noticed no scratches; in addition to opportunity and (possible) motive, the weight of the case against defendant lies in his false explanations to the police and on the stand.[2] On this record, we cannot say that the lack of prejudice appears beyond a reasonable doubt. *Chapman,* therefore, compels a reversal.

The judgment is reversed.

Jefferson, Acting P. J., and Dunn, J., concurred.

---

[2] It is not questioned that, if the evidence of the statements to Sergeant Green was inadmissible, the subsequent testimony falls under the rule of *People* v. *Spencer* (1967) 66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715].