[Crim. No. 20077. May 9, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK JAY PETTINGILL, Defendant and Appellant.

## COUNSEL

Franklyn S. Michaelson, under appointment by the Supreme Court, and Hatch & Parent for Defendant and Appellant.

Roger S. Hanson, John M. Pitkin and Cherie A. Parker as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Kent M. Bridwell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—Defendant was charged with four counts of burglary (Pen. Code, § 459) and pleaded not guilty. Pursuant to Penal Code section 1538.5 he moved to suppress a confession he had made while in jail, together with certain physical evidence found in a search to which he had consented in the course of the confession. The motion was denied. Defendant then withdrew his original pleas and pleaded guilty to two counts of the information. On the People's motion the other two counts were dismissed in the interest of justice, and defendant was sentenced to state prison for the term prescribed by law. He appeals from the

judgment, attacking only the denial of his motion to suppress. (Pen. Code, § 1538.5, subd. (m).) In addressing that issue we may consider defendant's primary contention that the confession was obtained in violation of his privilege against self-incrimination. (*People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 735 [125 Cal.Rptr. 798, 542 P.2d 1390].)[1]

About 10 p.m. on Saturday, February 7, 1976, Officer Berry of the Eureka Police Department arrested defendant and three companions at the scene of a burglary in that city. He placed defendant in handcuffs and advised him of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436, 467-473 [16 L.Ed.2d 694, 719-723, 86 S.Ct. 1602, 10 A.L.R.3d 974].[2] Berry asked defendant if he understood these rights, and defendant replied that he did. The officer then asked defendant if, "having these rights in mind," he wanted to talk to the police. Defendant refused to do so, and he was transported to the Eureka police station and booked.

The arrest of two of defendant's companions had taken place in a nearby parked car. Visible in that car were numerous items of personal property, including a pill bottle which the police promptly seized. From the label on the bottle the police learned the prescription had been issued to a person with a Santa Barbara address. The police became suspicious that much of the property in the car was stolen, and telephoned the Santa Barbara Police Department. Detective Rogers of that department undertook an investigation of the possible connection of defendant and his companions with four recent burglaries in Santa Barbara.

Meanwhile, some two hours after the arrest—i.e., approximately midnight on February 7—Officer Berry renewed the interrogation of defendant at the Eureka police station. The officer readvised defendant of his *Miranda* rights and "asked him again if he wished to make a

---

[1]Had there been no search and seizure of physical evidence and hence no motion to suppress under section 1538.5, defendant's guilty pleas would have foreclosed appellate review of the admissibility of his confession. (*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 895-896 [135 Cal.Rptr. 786, 558 P.2d 872].)

[2]The officer testified at the preliminary hearing that he read defendant these rights from a card which contained the following admonitions:

"You have the right to remain silent.

"Anything you say can and will be used against you in a court of law.

"You have the right to talk to a lawyer and have him present with you while you are being questioned.

"If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning, if you wish."

statement . . . ." Again defendant replied that he did not want to talk to the police, and he was transferred to the county jail.

On Monday, February 9, Detective Rogers of the Santa Barbara Police Department arrived in Eureka to pursue his investigation. The Eureka police turned over to Rogers the suspected stolen property, and advised him that defendant had twice refused to make a statement. Rogers then interrogated defendant's three companions in turn. Each was given the *Miranda* warnings, replied in the affirmative when asked to waive those rights, and confessed to participating in the Santa Barbara burglaries.

Finally, on Tuesday, February 10—i.e., three days after the arrest—Detective Rogers initiated a third interrogation of defendant, despite knowledge that defendant had previously refused to discuss his criminal involvement. The questioning took place in the county jail. Rogers began by telling defendant that his three companions had confessed to committing the Santa Barbara burglaries; that one of his companions told the police that various items taken in those burglaries had been pawned by defendant in Los Angeles; that the Los Angeles Police Department investigated the lead and found that defendant had in fact pawned such items on five or six occasions; that he, Rogers, had also been informed that defendant had broken into a van and stolen some articles and then hidden them at a state beach; and that he had recovered the articles at the place described.

After reciting these facts Detective Rogers again read defendant his *Miranda* rights, established that he understood them, and asked if defendant wanted to talk to him. This time defendant replied, "I guess so, yeah." Taking this to be a valid waiver of defendant's privilege against self-incrimination, Rogers proceeded to question him about the four Santa Barbara burglaries. Defendant confessed to the crimes.

On cross-examination Detective Rogers conceded that defendant had previously done nothing to indicate a desire to talk to him. And when on direct examination defendant was asked why he had changed his mind about talking to the police on the occasion of the third interrogation, he explained: "I just wanted to get them off my back, and I figured the only way I could is to say something, and when the last officer talked to me, you know, for a pretty long time, I figured the only way I could was to go ahead and say something."

Defendant contends his confession was inadmissible because it was the product of custodial interrogation renewed by the police after he had twice indicated to them that he wished to remain silent. A long line of decisions of this court holds that the introduction of such a confession violates the privilege against self-incrimination of article I, section 15, of the California Constitution.[3] That privilege, we have ruled, "precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in *Miranda* and its California progeny." (*People* v. *Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272].) We review first the relevant language of *Miranda,* then the holdings of its "California progeny" which have applied that language and made it an intrinsic part of the law of this state.

## I

The *Miranda* decision was premised on the perception that interrogation of a suspect in police custody is inherently coercive. (384 U.S. at pp. 445-458 [16 L.Ed.2d at pp. 707-714].) To insure that any statement the suspect makes in that setting is a product of his free will, the United States Supreme Court held that the interrogation must be surrounded by certain essential procedural safeguards: before any questioning begins the police must give the suspect the now-familiar "*Miranda* warnings," advising him primarily of his right to remain silent and to have the assistance of counsel (fn. 2, *ante*); to be valid, any waiver thereof must be both knowing and intelligent; and the questioning must terminate if the suspect directly or indirectly invokes any of these rights. (*Id.,* at pp. 467-479 [16 L.Ed.2d at pp. 719-727].)

On the latter point the *Miranda* court reasoned as follows: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free

---

[3]"Persons may not ... be compelled in a criminal cause to be a witness against themselves . . . ."

choice in producing a statement after the privilege has been once invoked." (Fn. omitted; *id.,* at pp. 473-474 [16 L.Ed.2d at p. 723].)

Of course, because no warnings of any kind were given in *Miranda,* the decision did not actually adjudicate the precise issue now before us. That issue, which has often been presented to the courts since *Miranda,* typically arises from the following sequence of events: the police give the suspect the *Miranda* warnings and seek to question him, but he successfully invokes his right to remain silent; rather than promptly release or arraign him, however, the police continue to hold him in custody; thereafter the police again give him the *Miranda* warnings and renew the interrogation, and this time he confesses. There are variations on this theme: there may be more than two attempts at interrogation; the interval between interrogations may be long or short; at the start of the second or subsequent interrogation the police may or may not confront the suspect with additional evidence or statements of his accomplices; and the later questioning may be conducted by a different police officer, in a different location, and deal with a different crime. Nevertheless, in a long line of decisions this court has consistently held that a statement taken from the suspect in any of these circumstances is inadmissible because in violation of the principles of *Miranda* and the privilege against self-incrimination of the California Constitution.

The line began with *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]. There the defendant and two companions were arrested for burglary and taken to the police station. The police gave the defendant the *Miranda* warnings and asked him to sign a waiver of his rights. He refused. The police then confronted him with his two accomplices, who had previously confessed and implicated him. The police again gave the defendant the *Miranda* warnings and renewed their request that he sign the waiver. This time he did so, and confessed to the burglary.

We held that after a defendant has once demonstrated he does not wish to waive his privilege against self-incrimination, the police cannot lawfully subject him to a new round of interrogation even if they repeat the *Miranda* warnings: "By his refusal to waive his constitutional rights initially, defendant indicated that he intended to assert his rights—the privilege had been *once invoked*—and all further attempts at police interrogation should have ceased." (*Id.,* at p. 719.) Because the confession was thus obtained in violation of the constitutional privilege, we held its admission in evidence to be prejudicial per se. (*Id.,* at p. 720.)

The second case of this type was *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]. There the defendant was arrested and given the *Miranda* warnings. He responded by saying, "Call my parents for my attorney." The arresting officers neither complied with this request nor communicated it to their superiors. At the police station the defendant was again advised of his *Miranda* rights. After he was booked another officer gave the *Miranda* warnings for the third time, and asked if the defendant was willing to talk to him. The defendant agreed, and confessed to murdering his wife.

After reversing the judgment of conviction on other grounds, we addressed the admissibility of the confession for the guidance of the court on retrial. We declared that "One of the primary 'protective devices' envisioned by *Miranda* is that requiring that custodial interrogation wholly cease when the suspect indicates in any manner that he wishes to exercise his Fifth Amendment privilege." (*Id.,* at p. 535.) The defendant's request that his attorney be called, we reasoned, was such an indication. (*Id.,* at p. 536.) And we rejected the People's argument that the confession was nevertheless "voluntary" because after making that request the defendant apparently sought to talk with the police about his family troubles: "as we also suggested in *Fioritto,* the teaching of *Miranda* does not permit us to characterize as 'voluntary' or 'spontaneous' any statements specifically obtained through custodial interrogative processes undertaken subsequent to a defendant's assertion of the privilege, for those are the very processes which *must cease* at that moment. As we indicated in *Fioritto* and have reiterated above, the *cessation* of custodial interrogative processes upon assertion of the privilege is one of the 'protective devices' which must be employed 'to dispel the compulsion inherent in custodial surroundings' (384 U.S. at p. 458 [16 L.Ed.2d at p. 714]), and any statement obtained without the use of that device is not admissible." (*Id.,* at p. 537.)

In the following year we decided *People* v. *Randall* (1970) 1 Cal.3d 948 [83 Cal.Rptr. 658, 464 P.2d 114]. There the defendant was arrested, given the *Miranda* warnings, and taken to the police station. During the booking process the defendant was permitted to make two phone calls, and he chose to call an attorney. The police nevertheless questioned him several times that day and the next, prefacing each interrogation with a reiteration of his *Miranda* rights. Finally the defendant agreed to waive those rights, and confessed to the crime of grand theft.

Relying on *Fioritto* and *Ireland*, we reversed the conviction. We first reaffirmed that the "obligation on the police to entirely terminate custodial interrogation upon invocation of the Fifth Amendment privilege is one of the primary 'protective devices' fashioned by *Miranda*." (Fn. omitted; *id.,* at p. 954.) We then held that the defendant's phone call to an attorney should be deemed an invocation of his privilege, as the People failed to sustain their burden of demonstrating the contrary. (*Id.,* at pp. 955-958.) We rejected the People's claim that the confession was "voluntary" because preceded by renewed *Miranda* warnings and a waiver of the defendant's rights: "After the initial assertion of the privilege, the defendant is entitled to be free of police-initiated attempts to interrogate him. Any statements made by a defendant in response to such questioning cannot be characterized as voluntary. The record in this case is clear that the defendant made no efforts to communicate with the police after his conversation with the attorney and each session of questioning was resumed on the initiative of the arresting officers. It is just such police-initiated interrogation that *Fioritto* and *Ireland* hold *cannot* produce voluntary waivers of spontaneous statements." (*Id.,* at p. 958.)

The fourth case of this sequence is *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]. There a juvenile was arrested and taken to the police station. He asked to see his father, who had arrived at the station during the booking process, but permission was denied. Thereafter the police carefully explained to the juvenile his *Miranda* rights; he waived them, and subsequently confessed to assault and murder.

The ensuing convictions were reversed. We reasoned that the juvenile's request to see his father should have been deemed an invocation of his privilege against self-incrimination and should have been respected even though made prior to the *Miranda* warnings. The failure of the police to terminate the interrogation at that time rendered the confession inadmissible "even though it was subsequently preceded by a knowing and intelligent waiver of the privilege, as we held under identical circumstances in *Fioritto, Ireland* and *Randall*, because: 'After the initial assertion of the privilege, the defendant is entitled to be free of police-initiated attempts to interrogate him. Any statements made by a defendant in response to such questioning cannot be characterized as voluntary.' (*People* v. *Randall, supra,* 1 Cal.3d 948, 958.)" (*Id.,* at p. 384.)

There followed a series of four decisions in which we relied in varying contexts on *Fioritto* and its progeny for the proposition that once a

suspect indicates he wishes to assert his privilege against self-incrimination, it is unlawful for the police to continue or renew the interrogation and any statement elicited thereafter is inadmissible. (*People* v. *Carr* (1972) 8 Cal.3d 287, 297 [104 Cal.Rptr. 705, 502 P.2d 513]; *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 412 [118 Cal.Rptr. 617, 530 P.2d 585]; *People* v. *Superior Court (Zolnay)* (1975) *supra,* 15 Cal.3d 729, 735-737; *People* v. *Disbrow* (1976) *supra,* 16 Cal.3d 101, 104-106.)

Finally, in *People* v. *Enriquez* (1977) 19 Cal.3d 221 [137 Cal.Rptr. 171, 561 P.2d 261], the defendant was arrested four hours after he was seen inflicting fatal stab wounds to the victim, and was subsequently interrogated in custody. The police gave him the *Miranda* warnings and asked if he wished to talk about the case. He replied in the affirmative, but immediately thereafter told each of his two interrogators that he wanted a lawyer present before discussing the matter further. Rather than honoring the request, however, the police pressed him not to assert this right. They gave him the *Miranda* warnings again, and this time he waived his right to counsel. The interrogation proceeded, and the defendant made inculpatory statements.

After reversing the judgment of conviction of manslaughter on other grounds, we addressed the admissibility of the statements for the guidance of the court on retrial. We cited *Fioritto, Ireland, Randall,* and *Burton* for the proposition that once a suspect indicates he wants an attorney, *all* interrogation must cease until an attorney is present. (*Id.,* at p. 237.) We rejected the People's argument that even though the defendant had explicitly asked for a lawyer, his subsequent statements vere voluntary: we held rather that the statements were the product of continued police pressure to waive the right to counsel, emphasizing that "We noted in *Fioritto* that the *Miranda* prohibition was against 'continued questioning after an individual has *once* asserted his constitutional rights.' " (*Id.,* at p. 238.) ▆ ▆▆▆ The statements, we concluded accordingly, were inadmissible.[4]

---

[4]Even when it is the suspect who initiates the renewed conversation with the police, the court must make an independent examination of the uncontradicted facts and will hold an ensuing confession involuntary in the traditional sense if it is found to be the product of improper threats or promises of leniency made by the police during the first interrogation. (See, e.g., *People* v. *McClary* (1977) 20 Cal.3d 218 [142 Cal.Rptr. 163, 571 P.2d 620].)

## II

■ The People seek to distinguish the foregoing precedents on factual grounds, stressing primarily two aspects of the record before us: (1) the interrogation which produced ·the confession did not immediately follow defendant's assertion of his right to remain silent, but came three days later; and (2) that interrogation was conducted by an officer of a different law enforcement agency and dealt with crimes different from those for which defendant had been arrested and first questioned. The distinctions, however, are not relevant to the purposes sought to be served by *Fioritto* and its progeny.

As noted at the outset, the *Miranda-Fioritto* line of decisions is premised on the perception that "the setting of in-custody interrogation" of a suspect without counsel is inherently coercive. That setting, with its subtle pressures of unfamiliar surroundings, physical and psychological isolation, and police-dominated atmosphere, remains the same whether the suspect is in custody for three hours or three days. It is true that after refusing to talk to the police defendant herein did not undergo immediately renewed interrogation, as in *Fioritto;* but he was spared that form of coercion only to be subjected to another, less obvious but perhaps more insidious.

By the People's own calculations, over 61 hours elapsed between the second and third interrogations of defendant. Throughout that period he was continually in police custody, and had not been taken before a magistrate for arraignment and appointment of counsel. Contrary to the People's suggestion, such a delay is not psychologically beneficial or even neutral: the longer an individual is held incommunicado, the greater his incentive to confess so as to end his isolation from family, friends, or counsel. And if during that period—as here—the police not once but three times repeat the *Miranda* warnings and ask if the defendant wants to talk to them, the compulsion to make a statement in order to "get them off my back" may be well nigh irresistible.[5]

These realities are reflected in the constitutional and statutory provisions of California law which have long required that a person arrested for or charged with crime be taken before a magistrate "without unnecessary delay." If the arrest is pursuant to a warrant, "The defendant

---

[5]For an example of a persistent "softening-up" technique, see *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 160 [141 Cal.Rptr. 698, 570 P.2d 1050].

must in all cases be taken before the magistrate *without unnecessary delay,* and, in any event, within two days after his arrest, excluding Sundays and holidays . . . ." (Italics added.) (Pen. Code, § 825.) If the arrest, as here, is without a warrant, "the person arrested, if not otherwise released, shall, *without unnecessary delay,* be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person shall be laid before such magistrate." (Italics added.) (Pen. Code, § 849, subd. (a); see also *id.,* § 847.) And the Constitution itself declares (art. I, § 14) that a person accused by felony complaint "shall be taken without unnecessary delay before a magistrate" who shall advise him of the charges against him and of his right to counsel. (See also Pen. Code, § 859.)[6]

Over a decade ago we firmly condemned police violations of the letter and spirit of these laws in the case of *People* v. *Powell* (1967) 67 Cal.2d 32, 58-60 [59 Cal.Rptr. 817, 429 P.2d 137]. There the defendants were held in police custody for some three days prior to arraignment, during which time they were repeatedly questioned and made self-incriminating statements. We ruled the statements inadmissible because obtained in violation of the then-governing standards of custodial interrogation (*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]; *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]); to that extent, the cases are different. ▪ But our admonitions in *Powell* on the subject of unnecessary delay in arraignment remain pertinent today—and in view of the police practices shown by the record herein, they bear repeating. That delay, we said, " 'violates a fundamental right of the arrested person and is in disobedience of the law.' (*People* v. *McDowell* (1962) 204 Cal.App.2d 734, 736 [22 Cal.Rptr. 646].) We have characterized such conduct by the police as 'patently illegal,' and have rejected the argument that its illegality is somehow lessened by the fact that 'similar conduct is not unusual' or 'makes the work of the police and the district attorney easier.' (*People* v. *Stroble* (1951) 38 Cal.2d 615, 625 [226 P.2d 330], affd. 343 U.S. 181 [96 L.Ed. 872, 72 S.Ct. 599].) Indeed, we have further stressed that section 825 does not authorize even a two-day detention in all cases, 'but, instead, places a limit upon what may be considered a necessary delay, and a detention of less than two days, if unreasonable under the circumstances, is in violation of the statute.' (*Dragna* v. *White* (1955) 45 Cal.2d 469, 473 [289 P.2d 428].)

---

[6]In addition, Penal Code section 145 provides that "Every public officer or other person, having arrested any person upon a criminal charge, who willfully delays to take such person before a magistrate having jurisdiction, to take his examination, is guilty of a misdemeanor."

■  "It is true that the federal rule of *McNabb* v. *United States* (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608], i.e., that any confession obtained during an illegal detention is ipso facto inadmissible, has not been adopted in California (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 10 [291 P.2d 929]), and that a violation of a defendant's right to be taken before a magistrate without unnecessary delay does not require reversal 'unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof' (*People* v. *Combes* (1961) 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4], and cases there cited). But these holdings must not be misconstrued as acquiescence on our part in any continuation of such unlawful practices. The Constitution and the several statutes quoted above are clear and explicit on this point, and must be obeyed.  ■  The principal purposes of the requirement of prompt arraignment are to prevent secret police interrogation, to place the issue of probable cause for the arrest before a judicial officer, to provide the defendant with full advice as to his rights and an opportunity to have counsel appointed, and to enable him to apply for bail or for habeas corpus when necessary. As the United States Supreme Court observed in *Mallory* v. *United States* (1957) 354 U.S. 449, 454-455 [1 L.Ed.2d 1479, 77 S.Ct. 1356], construing rule 5(a) of the Federal Rules of Criminal Procedure which is similar in this respect to our own legislation, 'The arrested person may, of course, be "booked" by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.' " (67 Cal.2d at pp. 59-60.)

■  It follows that the failure of the police to cease all attempts at interrogation of defendant herein after he refused to waive his right to remain silent was not cured by their subsequent failure to comply with the laws requiring his prompt arraignment. Two such wrongs do not make a right; they remain separate abuses, compounding the infringement of defendant's privilege against self-incrimination.

Nor is the failure of the Eureka police to cease efforts to question defendant cured by the fact that his subsequent interrogation was at the hands of the Santa Barbara police and dealt with different offenses. The People speculate that a suspect "may be perfectly willing to speak with the authorities and thereby waive his rights as to one particular offense, and yet wish to remain silent as to another offense," and "so too might he be willing to speak with representatives of one agency while preferring

not to do so with those from another agency." The argument is unconvincing.

To begin with, it is not supported by the record. The first time defendant asserted his right to remain silent was under questioning by Officer Berry of the Eureka Police Department. But it was the same officer who renewed the questioning two hours later at the police station. Thus the principles of *Fioritto* were violated long before the "representative from another agency" entered the scene. Nor does it appear, as the People claim, that defendant deliberately invoked his privilege against self-incrimination "on a selective basis," i.e., by choosing to talk about the Santa Barbara burglaries but not the Eureka burglary. On the contrary, after his arrest defendant observed the Eureka police looking into the car in which he had been riding; he knew it contained numerous items taken in the Santa Barbara burglaries; and he testified that when the questioning was renewed two hours later at the police station he believed Officer Berry wanted to ask him about "everything that they saw in the car," i.e., including the loot from the Santa Barbara burglaries. As noted, defendant then refused for the second time to talk with the police.[7]

In any event, the People's proposed limitation on the *Fioritto* rule is objectionable on broader grounds. It might catch the occasional sophisticated criminal who wishes to make selective statements about certain charges to specified agencies; but it would do so at the cost of sweeping into its net the large majority of suspects who see the uniform only as a symbol of police authority, who neither know nor care about the precise jurisdictional competence of their interrogators, and who do not want to talk to any of them. Little would remain of the *Fioritto* rule if it could be evaded simply by sending in an officer from a different police or sheriff's department every time a suspect asserts his right to remain silent, or by changing the subject of the questioning from one of the crimes under investigation to another. We cannot countenance such a drastic dilution of the effectiveness of the *Fioritto* rule in protecting the rights of California citizens.[8]

---

[7] It seems unlikely, moreover, that defendant would "selectively" choose to confess to the four Santa Barbara burglaries, in which he was implicated only by circumstantial evidence and unproved accusations, while refusing to say so much as a word about the Eureka burglary, in which he was caught red-handed.

[8] We have previously considered a fact situation similar to the case at bar. In *People* v. *Randall* (1970) *supra*, 1 Cal.3d 948, the defendant was arrested in Los Angeles on a charge apparently originating in that county. Given the *Miranda* warnings, he called an attorney. The next morning he was again questioned about the Los Angeles charge. After that session, however, the Los Angeles police received a phone call from the Santa Barbara

We conclude that the defendant's confession was inadmissible under article I, section 15, of the California Constitution (fn. 3, *ante*) and the authorities cited herein. The trial court therefore erred in denying his motion to suppress, and the judgment must be reversed.

### III

The People finally contend that despite the unquestioned inadmissibility of defendant's confession under California law, we are compelled to permit its use in our courts by the case of *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321]. There the defendant was arrested in connection with certain robberies, taken to the Detroit police station, and given the *Miranda* warnings by a detective of the robbery bureau. The defendant refused to answer any questions about the robberies, and the interrogation ceased. Some two hours later, however, a different detective took the defendant to the homicide bureau of the police department in order to question him about an unrelated holdup-murder. The defendant was again given the *Miranda* warnings. At first he denied any involvement in the crime; but after the detective told him that an accomplice had admitted his participation and had named him as the "shooter," the defendant made a statement implicating himself in the murder.[9]

Contrary to the Michigan appellate court, the United States Supreme Court held that use of the statement to convict the defendant of murder did not violate the privilege against self-incrimination of the Fifth Amendment to the federal Constitution. The court reaffirmed the principles of *Miranda,* but rejected the view that once a suspect has asserted his right to remain silent all further police interrogation must cease until counsel is present or the suspect is arraigned. Instead the court adopted a factual test turning on the circumstances of the renewed interrogation: "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " (Fn. omitted.) (*Id.,* at p. 104 [46 L.Ed.2d at p. 321].) The court then

---

Sheriff's office advising them of an outstanding warrant for the defendant's arrest on a grand theft charge in Santa Barbara County. The Los Angeles police then renewed the interrogation, repeated the *Miranda* warnings, and questioned the defendant about the Santa Barbara charge. He waived his rights and confessed to the latter crime. As noted above, we held the confession inadmissible under *Fioritto* and *Ireland.*

[9]At trial the detective admitted he had lied to the defendant in telling him that his accomplice had confessed to the murder.

reviewed the record and found that the defendant's right to stop the questioning had been "fully respected in this case." *(Ibid.)* The court identified several "circumstances" in support of its finding, and summarized them as follows: "the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *(Id.,* at p. 106 [46 L.Ed.2d at p. 322].)

Because of the importance of the legal issue we shall not attempt, as defendant urges us with some justification, to distinguish *Mosley* on its facts: for present purposes we shall concede that the "circumstances" relied on by the high court are essentially the same as those which we hold herein are inadequate to protect defendant's privilege against self-incrimination under the California Constitution. (Part II, *ante.)* We therefore proceed to the question of how this conflict between California and federal law is to be resolved.

We need not be detained, in reaching that question, by the People's effort to reopen the entire issue of the authority of the courts of this state to construe provisions of the California Constitution to furnish greater protections to our citizens than do textually parallel provisions of the federal Constitution. We recently addressed that issue in various contexts and in considerable depth. (See, e.g., *People* v. *Brisendine* (1975) 13 Cal.3d 528, 545-552 [119 Cal.Rptr. 315, 531 P.2d 1099] (illegal search and seizure); *People* v. *Longwill* (1975) 14 Cal.3d 943, 951 & fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753] (same); *People* v. *Disbrow* (1976) *supra,* 16 Cal.3d 101, 114-115 (privilege against self-incrimination); *People* v. *Hannon* (1977) 19 Cal.3d 588, 606-607 & fn. 8 [138 Cal.Rptr. 885, 564 P.2d 1203] (right to speedy trial).) We have examined anew the People's arguments on the point, and find no reason to depart from our firmly established precedents.

Nor do we need to refute in detail the People's claim that we can no longer rely on *Fioritto* and its progeny because they in turn relied on a reading of *Miranda* which *Mosley* has now repudiated: a similar sequence of events occurred in most of the decisions just cited. (See also *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 760-768 [135 Cal.Rptr. 345, 557 P.2d 929] (declining to follow *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 935 S.Ct. 1278]).) The construction of a provision of the California Constitution remains a matter of California law regardless of the narrower manner in which decisions of the United States Supreme Court may interpret provisions of the federal Constitution.

Respect for our Constitution as "a document of independent force" (*Brisendine,* at pp. 549-550 of 13 Cal.3d) forbids us to abandon settled applications of its terms every time changes are announced in the interpretation of the federal charter. Indeed our Constitution expressly declares that "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." (Cal. Const., art. I, § 24.)

Finally, our right to decline to follow *Mosley* in construing state law was reaffirmed in Justice Brennan's dissenting opinion in that very case. (423 U.S. at pp. 120-121 [46 L.Ed.2d at pp. 331-332].) In language we have noted once before (*Disbrow,* at p. 115 of 16 Cal.3d), he said: "In light of today's erosion of *Miranda* standards as a matter of federal constitutional law, it is appropriate to observe that no State is precluded by the decision from adhering to higher standards under state law. Each State has power to impose higher standards governing police practices under state law than is required by the Federal Constitution. [Citations.] . . . Understandably, state courts and legislatures are, as matters of state law, increasingly according protections once provided as federal rights but now increasingly depreciated by decisions of this Court. [Citations.] I note that Michigan's Constitution has its own counterpart to the privilege against self-incrimination." So too, of course, does the California Constitution.

The standard to be applied in resolving this issue is also now settled: "in the area of fundamental civil liberties—which includes not only freedom from unlawful search and seizure but all protections of the California Declaration of Rights—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental civil rights are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide *no less individual protection than is guaranteed by California law.*" (*Longwill,* at p. 951, fn. 4, of 14 Cal.3d; accord, *Serrano,* at p. 764 of 18 Cal.3d; *Hannon,* at p. 606 of 19 Cal.3d.) The question is not, as the People contend, whether the *Mosley* test "adequately protects" the rights of California citizens, but whether it provides *less* protection than has been guaranteed by the California Constitution since the *Fioritto* rule has been in effect.

■ Upon close analysis it appears that *Mosley* provides less such protection than *Fioritto* in two principal respects. First, on the facts of the case the high court held that a suspect's right to cut off questioning will be deemed "scrupulously honored" when the second interrogation (1) occurs "only after the passage of a significant period of time" and (2) is conducted by a different police officer and deals with a different crime. But these are precisely the techniques—lengthy incommunicado detention and the switching of interrogators and charges—which we hold herein (part II, *ante*) not only fail to protect the suspect's privilege against self-incrimination under the California Constitution but substantially endanger that privilege by increasing the pressures on the suspect to confess in order to end his forced isolation and "get them off my back."[10]

Secondly, the *Mosley* test is evidently designed to apply to other circumstances than those presented in the case itself. But the opinion does not attempt a compendium of such additional circumstances, and indeed the effort would have been futile. A major element of uncertainty is thus injected into the law: when has a suspect's right to cut off questioning been "scrupulously honored?" In *Mosley* the suspect was interrogated twice; will the confession be admissible when he is interrogated three times, as here, or even more? In *Mosley* two hours intervened between the interrogations; will the confession be admissible when the period of incommunicado detention is three days, as here, or still longer?

Not only is this obviously a question of degree, but the very elements of the equation remain unidentified. For example, in *Mosley* the second interrogation was conducted "by another police officer at another location" (423 U.S. at p. 104 [46 L.Ed.2d at p. 322]); will the confession be admissible if the interrogation is conducted by another officer but at the same location, or by the same officer but at another location? In *Mosley* the second interrogation dealt with "a crime different in nature and in time and place of occurrence" (*id.,* at p. 105 [46 L.Ed.2d at p. 322]); will the confession be admissible when, as here, the crimes are of the same nature, or, even though committed at different times and places, are part of a continuous course of conduct or share a common modus operandi? In *Mosley* the record was "not clear" as to what if anything the second detective knew about the first interrogation (*id.,* at

[10]We agree in this regard with the observation of Justice Brennan in his dissent (423 U.S. at p. 118 [46 L.Ed.2d at p. 330]) that the *Mosley* decision encourages law enforcement authorities "to continue the suspect's detention until the police station's coercive atmosphere does its work and the suspect responds to resumed questioning." (Fn. omitted.)

p. 105); will the confession be admissible when, as here, he is fully informed that the suspect was previously questioned and explicitly refused to waive his right to remain silent? Should it be admissible even if the second officer is ignorant of that fact?[11]

These are not idle inquiries. Given the high stakes involved in the admission of a confession into evidence, both trial and appellate counsel operating under the *Mosley* test would doubtless feel compelled to litigate every conceivable factual aspect of the issue of whether defendant's right to stop the interrogation was "scrupulously honored" in the case at hand. The consequences seem clear.

First, delays in adjudication would be inevitable. At all stages of a criminal proceeding, "The People have the burden of demonstrating that a questioned confession meets the constitutional tests of admissibility." (*Randall*, at p. 957 of 1 Cal.3d.) It follows, as the People concede, that in every case in which the defendant objects to the introduction of a confession obtained after he had asserted his right to remain silent, *Mosley* would require "the taking of evidence" to establish the facts necessary to apply its tests. As we explained in a closely related context, "It will then be necessary to interrupt the proceedings, not only at mid-trial but at mid-examination, for an evidentiary hearing, the outcome of which will be subject to later review on appeal. . . . In time there will arise an impressive body of law on the [*Mosley*] issue, rivaling that which presently exists in the area of search and seizure, as various appellate courts grapple on a case-by-case basis with the question . . . ." (*Disbrow,* at p. 111 of 16 Cal.3d.)

Not only would this constitute an "immense tax on judicial resources" (*id.,* at p. 112, fn. 11), but in a certain number of cases it would undoubtedly produce inconsistent results on essentially similar facts. The stability and predictability of the law on this important topic would thereby be impaired, making it more difficult for the police to conform

---

[11]"To say that the ignorance of the second officer concerning the earlier interview shields the second interview from attack not only would open the door to evasions by the police but it ignores the reason for the *Fioritto* rule, which is to prevent the police from wearing down a prisoner's resistance by repeated pressuring until he finally makes the statement desired in order to get peace. That pressure exists whether or not the successive would-be interrogators are acting in concert for that purpose, or are acting independently—it is the effect on the prisoner that *Fioritto* seeks to avoid." (*People v. Milton* (1969) 270 Cal.App.2d 408, 415-416 [75 Cal.Rptr. 803].)

their conduct to constitutional dictates.[12] No less important, instances of individual injustice would necessarily ensue: as defendant correctly observes, "Such a fundamental right as the privilege against self-incrimination is not adequately protected where its effectiveness depends upon subtle differences in either the evidence a defendant is capable of presenting or in the predisposition of the trier of fact."

It was precisely the purpose of the *Fioritto* line of decisions to protect the constitutional privilege by removing such vagaries from the law. Thus in *Fioritto* (at p. 717 of 68 Cal.2d) we declared that "A principal objective of [*Miranda*] was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions." That concern was vindicated in each of our decisions following *Fioritto;* in particular, in *Disbrow* (at p. 111 of 16 Cal.3d) we amplified on the reasoning as follows: "The precision with which the *Miranda* court established not simply broad procedural guidelines but a precise manual for the conducting of custodial interrogations can be interpreted only as expressing an intention to create a single, uncomplicated, universally applicable test for determining whether a particular confession was coerced."

In the same case, of course, we invoked this rationale in declining to follow a decision of the United States Supreme Court construing the Fifth Amendment (*Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]) which in our view resulted in less protection to our citizens than the privilege against self-incrimination of the California Constitution under the rule of "*Miranda* and its California progeny." (16 Cal.3d at p. 113.) The rationale is equally applicable here, and together with the reasons given above, leads us to a similar conclusion: the *Fioritto* rule, rather than the *Mosley* test, will remain the rule of decision in all state prosecutions in California.[13]

---

[12]Even in applying the comparatively inflexible *Fioritto* rule under present law, the courts have sometimes reached contrary conclusions on admissibility that are difficult to justify in terms of the factual differences between the cases. (Compare, e.g., *People* v. *Miller* (1974) 40 Cal.App.3d 228 [114 Cal.Rptr. 779] (per Thompson, J.), with *People* v. *Parker* (1975) 45 Cal.App.3d 24 [119 Cal.Rptr. 49] (same).) We have no doubt that such discrepancies would be far more frequent under *Mosley*.

[13]Distinguished judges of all philosophical bent appear to agree on the historical underpinning and the pragmatic desirability of retaining federalism and promoting states' rights. For a sampling of thoughtful views on the subject, see the writings of Justice Brennan (Brennan, *State Constitutions and the Protection of Individual Rights* (1977) 90 Harv.L.Rev. 489), Justice Black (*Younger* v. *Harris* (1971) 401 U.S. 37, 44-45 [27 L.Ed.2d

The judgment is reversed.

Bird, C. J., Tobriner, J., Manuel, J., and Newman, J., concurred.

**CLARK, J.,** Dissenting.—Under this court's decision of *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], defendant's confession is arguably inadmissible. But under the United States Supreme Court's more recent decision of *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], defendant's confession is admissible. The question presented therefore is whether in light of *Mosley* we shall continue to adhere to *Fioritto*.

The majority reaffirm *Fioritto* on the following ground. "The construction of a provision of the California Constitution remains a matter of California law regardless of the narrower manner in which decisions of the United States Supreme Court may interpret provisions of the federal Constitution. Respect for our Constitution as 'a document of independent force' (*Brisendine*, at pp. 549-550 of 13 Cal.3d) forbids us to abandon settled applications of its terms every time changes are announced in the interpretation of the federal charter. Indeed our Constitution expressly declares that 'Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution.' (Cal. Const., art. I, § 24.)" (*Ante*, pp. 247-248.)

The short answer to this argument is that *Fioritto* was not decided under the California Constitution; rather, it was based on this court's understanding of the principles announced in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], a United

---

669, 675-676, 91 S.Ct. 746]), Justice Brandeis (*New State Ice Co.* v. *Liebmann* (1932) 285 U.S. 262, 311 [76 L.Ed. 747, 771, 52 S.Ct. 371] (dis. opn.)), Judge Henry J. Friendly (Friendly, *Federalism: A Foreword* (1977) 86 Yale L.J. 1019), Justice Harlan (*Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229] (conc. opn.); *Malloy* v. *Hogan* (1964) 378 U.S. 1, 14 [12 L.Ed.2d 653, 663, 84 S.Ct. 1489] (dis. opn.)), and Chief Justice Burger (*California* v. *Green* (1970) 399 U.S. 149, 171 [26 L.Ed.2d 489, 504, 90 S.Ct. 1930] (conc. opn.).) Justice Harlan put it succinctly in *Malloy:* "About all that the Court offers in explanation of this conclusion is the observation that it would be 'incongruous' if different standards governed the assertion of a privilege to remain silent in state and federal tribunals. Such 'incongruity,' however, is at the heart of our federal system. The powers and responsibilities of the state and federal governments are not congruent; under our Constitution, they are not intended to be." (378 U.S. at p. 27 [12 L.Ed.2d at p. 671].) And Chief Justice Burger added in *Green*, "neither the Constitution as originally drafted, nor any amendment, nor indeed any need, dictates that we must have absolute uniformity in the criminal law in all the States." (399 U.S. at pp. 171-172 [26 L.Ed.2d at p. 504].)

States Supreme Court decision interpreting the Fifth Amendment to the United States Constitution.[1] The California Constitution was not even mentioned in *Fioritto*.

The United States Supreme Court is the ultimate arbiter of the limits of its own decisions. Now that the high court has declared a confession obtained under the circumstances of this case admissible under *Miranda*, honesty—analytical and ordinary—compels us to overrule *Fioritto* to the extent it conflicts with *Mosley*. To say that "[r]espect for our Constitution as 'a document of independent force' " forbids us to depart from *Fioritto* when our Constitution in fact had no part in that decision is less than honest. The majority's curious response to this objection is that the same might be said of most of the decisions on which they rely. (*Ante*, p. 247.) Indeed, the same not only might be, but has been said. (See, e.g., *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 533-537 [134 Cal.Rptr. 774, 557 P.2d 65] (Clark, J., dis.).)

But what of article I, section 24 of the California Constitution, declaring that "Rights guaranteed by this Constitution are not dependent upon those guaranteed by the United States Constitution?" The majority contend this section compels us to interpret provisions of our Constitution without regard to the United States Supreme Court's interpretations of identical provisions in the federal Constitution. For the reasons expressed in my dissenting opinion in *People* v. *Norman* (1975) 14 Cal.3d 929, 940-942 [123 Cal.Rptr. 109, 538 P.2d 237], I still maintain that unless its text or history support a broader construction, a state constitutional provision should be interpreted as affording a criminal defendant no greater right than the parallel provision of the federal Constitution. (See, e.g., *People* v. *Maher* (1976) 17 Cal.3d 196, 204 [130 Cal.Rptr. 508, 550 P.2d 1044] (Clark, J., dis.).)

On the other hand, were the majority consistent in rejecting not only those high court decisions with which they disagree but also those with which they agree, I might subscribe to their approach. Indeed, I can conceive of no more salutary exercise than examining our state Constitu-

---

[1]There can be no serious dispute on this point. The opening paragraph of *Fioritto* sets the tone for the entire opinion when, after reciting the defendant's conviction for burglary, it states "At trial the People introduced into evidence a confession signed by defendant, and defendant contends that this confession was elicited under circumstances that were violative of the standards enunciated by the United States Supreme Court in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. We conclude that under the explicit directives of *Miranda* defendant's confession was inadmissible, and accordingly the judgment must be reversed." (68 Cal.2d at p. 716.)

tion afresh, without regard to the gloss put upon the federal Constitution by the United States Supreme Court. But then we would have to disregard not only *Mosley,* but also *Miranda,* and even *Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341].[2] We would have to return to square one and decide this case by asking ourselves—consistent with our oath of office—not what the Warren Court would have done, but what the Founders of our Constitution would have us do. But instead the shell game continues. (See *People* v. *Ramey* (1976) 16 Cal.3d 263, 277 [127 Cal.Rptr. 629, 545 P.2d 1333] (Clark, J., dis.).)

Raoul Berger reminds us that "[a] common historicist fallacy is to import our twentieth-century conceptions into the minds of the Founders." (Government by Judiciary: The Transformation of the Fourteenth Amendment (1977) p. 306.) The majority's "new states' rights" doctrine is a clear example of this fallacy—importing the high court's social philosophy of the 1960s into our own Constitution of a century ago.

The judgment should be affirmed.

**RICHARDSON, J.**—I agree with the dissent of Justice Clark that the judgment should be affirmed. As I expressed in an earlier case, which also involved an extension of the doctrines of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], "In my view, in the absence of very strong countervailing circumstances we should defer to the leadership of the nation's highest court in its interpretation of nearly identical constitutional language, rather than attempt to create a separate echelon of state constitutional interpretations to which we will advert whenever a majority of this court differ from a particular high court interpretation." (*People* v. *Disbrow* (1976) 16 Cal.3d 101, 119 [127 Cal.Rptr. 360, 545 P.2d 272] [dis. opn.].)

---

[2]In *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513] this court adopted the exclusionary rule, the so-called *Weeks* doctrine, not as a matter of state constitutional law, but as a judicially declared rule of evidence. (*Id.,* at p. 442.)