[No. B014840. Second Dist., Div. Seven. Aug. 17, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WARD WARNER, Defendant and Appellant.

COUNSEL

Curt V. Leftwich for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Gary R. Hahn and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, P. J.—Defendant Michael Warner appeals from a judgment (order granting probation) following conviction of unlawful sexual intercourse (Pen. Code, § 261.5) between June and July 1983 (count II), and two counts of lewd conduct (Pen. Code, § 288, subd. (a)) between September 1980 and June 1981, with his adopted daughter.[1] Defendant challenges the admission of some of his postarrest statements as elicited in violation of the California rule of *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], and its progeny, that once a suspect has invoked his *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) right to remain silent, any police-initiated interrogation violates his privilege against self-incrimination under the California Constitution. We hold that Proposition 8 abrogated the *Pettingill* rule; and that defendant's statements pertaining to post-Proposition 8 acts were properly admitted under the federal rule of *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321].

---

[1] The Supreme Court transferred this case to us for reconsideration in light of its recent decision in *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307].

## FACTS

The evidence at the section 402 (Evid. Code) hearing established the following: defendant was arrested at his home about 6:30 p.m. on February 14, 1984, by Police Officer Thomas Pederson and his partner; Officer Pederson told defendant he was investigating allegations by his daughter that he had raped her; defendant responded, "I don't know if I should talk to you," whereupon Officer Pederson said he would take him to the station, read his rights to him, and "you can make up your mind then." On the way to the station defendant again said he did not know if he should talk to him, and the officer, not wanting to prompt any statement, again told him to wait until they arrived at the station; then saying "I'm in a great deal of trouble," defendant asked his advice, and Officer Pederson reiterating he could not advise him on such a matter, ended the conversation. At the station, Officer Pederson read to defendant his constitutional rights and asked him if he wished to waive them; defendant invoked his right to remain silent whereupon Officer Pederson immediately ceased questioning. At this point, Officer Pederson stopped any further questioning.

The next day (Feb. 15) about 10 a.m., Detective Gallon, having reviewed a crime report prepared by Officer Vidal but not having talked to Officer Pederson and unaware that the previous day defendant had been advised of his *Miranda* rights and invoked them, met with defendant in the jail and told him he wished to speak to him about his arrest and the charges; defendant said he was willing to talk to him. Detective Gallon in the presence of Detective Jones then read to him his constitutional rights from a standard form; asked if he understood his rights, defendant responded he did; asked if, having those rights in mind, he wished to waive them and answer his questions, defendant "said that yes, he would be willing to talk with [him] about the case" and was willing to talk to him without an attorney being present. Defendant then waived his rights and signed the waiver form. Thereafter, defendant talked with Detective Gallon about his activities with his adopted daughter. The detective wrote up the statement, handed it to defendant who read it, then read it aloud to defendant, who agreed it was a fair statement of what he had told him, and signed it. At no time were any threats or promises made to defendant; the interview lasted from 10 to 10:30 a.m. It was only after Detective Gallon later read the arrest report and talked to Officer Pederson, that he realized defendant had been advised of his constitutional rights the day before and invoked them.

The trial court ruled inadmissible defendant's and oral written statements pertaining to acts occurring prior to June 9, 1982 (counts III and V), the effective date of Proposition 8 (see *People v. Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149]), as obtained in violation of the

California privilege against self-incrimination; but ruled admissible under federal constitutional standards (*Michigan* v. *Mosley, supra,* 423 U.S. 96) those statements relating to acts occurring after June 9, 1982 (count II) on the ground that *Pettingill-Fioritto* (*People* v. *Pettingill, supra,* 21 Cal.3d 231; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625]) did not survive Proposition 8.[2]

I

EFFECT OF PROPOSITION 8 ON PETTINGILL

At issue is the post-Proposition 8 validity of the *Pettingill* rule. Article I, section 28, subd. (d), of the state Constitution, the Proposition 8 "Truth-in-Evidence" provision, by its express terms forbids the exclusion of relevant evidence in any criminal proceeding; but it does contain a savings clause exempting any "existing statutory rule of evidence relating to privilege or hearsay."[3] Defendant contends that his confession should have been excluded in its entirety because the *Pettingill* rule that once a defendant invokes his *Miranda* rights, any police-initiated interrogation violates his privilege against self-incrimination, is such a statutory privilege rule pursuant to Evidence Code section 940.[4] We agree with respondent that the *Pettingill* rule was effectively abrogated by Proposition 8 which makes the federal constitutional standard of *Michigan* v. *Mosley, supra,* 423 U.S. 96, the sole determinant of admissibility.

Recently, in *People* v. *May, supra,* 44 Cal.3d 308, our Supreme Court, construing section 28, subd. (d) with respect to the privilege against self-incrimination, held that Proposition 8 abrogated the rule of *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272] that a defendant's extrajudicial statements elicited in violation of his *Miranda* rights are inadmissible even for impeachment. *May* ruled that "the 'Truth-in-Evidence' provision of our Constitution was probably intended by the California voters as a means of (1) abrogating *judicial* decisions which had required the exclusion of relevant evidence solely to deter police misconduct

---

[2] The *Pettingill* rule is often more interchangeably called the *Pettingill-Fioritto* rule. *Fioritto,* relying on *Miranda,* had held that once a suspect invoked his *Miranda* rights, police could not reinitiate questioning. After *Mosley* adopted a contrary factual test dependent on the circumstances (423 U.S. at p. 104 [46 L.Ed.2d at pp. 321-322]), *Pettingill* declined to follow *Mosley* and reaffirmed *Fioritto* as the rule in California.

[3] That section provides in pertinent part: "[R]elevant evidence shall not be excluded in any criminal proceeding . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay. . . ."

[4] Evidence Code section 940 provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him."

in violation of a suspect's constitutional rights under the state Constitution, while (2) preserving *legislatively* created rules of privilege insulating particular communications, such as the attorney-client or physician-patient privilege." (44 Cal.3d at p. 318, original italics.) In this connection, the Supreme Court reiterated its observation in *In re Lance W.* (1985) 37 Cal.3d 873, 887 [210 Cal.Rptr. 631, 694 P.2d 744] that " 'The people have apparently decided that the exclusion of evidence is not an acceptable means of implementing those rights, *except as required by the Constitution of the United States.*' " (*People* v. *May, supra,* 44 Cal.3d at p. 318, original italics.) *May* expressly rejected the claim that the *Disbrow* rule was a statutory rule of evidence relating to privilege or hearsay which was preserved by the savings clause of section 28, subd. (d). (*Id.* at pp. 318-320; *People* v. *Kimble* (1988) 201 Cal.App.3d 726, 731 [248 Cal.Rptr. 41].)

*May's* rationale and result apply equally to *Pettingill* which addressed the same issue of the privilege against self-incrimination as *Disbrow* "in a closely related context." (*People* v. *Pettingill, supra,* 21 Cal.3d at p. 250.) *Pettingill,* relying extensively on *Disbrow,* similarly declined to follow a contrary United States Supreme Court decision construing the Fifth Amendment, and held the evidence inadmissible on the independent state ground of the California constitutional privilege against self-incrimination. (*People* v. *Pettingill, supra,* at pp. 247, 250-251; *People* v. *Disbrow, supra,* 16 Cal.3d at p. 113.)[5] But "section 28(d) was intended to preclude this kind of reliance on the state Constitution to create new exclusionary rules rejected by applicable decisions of the United States Supreme Court." (*People* v. *May, supra,* 44 Cal.3d at p. 319.) That provision of Proposition 8 requires the abrogation of a judicially declared exclusionary remedy for such a constitutional violation based on police misconduct. (*Id.* at p. 317; see also *In re Lance W., supra,* 37 Cal.3d 873, 886-889.)

 Evidence Code section 940 does not preserve *Pettingill.* Section 940 is a statutory recognition of the constitutional privileges against self-incrimination (*People* v. *May, supra,* 44 Cal.3d at p. 316) which relates only to substantive, not remedial rights (*id.* at p. 317). We find unpersuasive defendant's claim that, unlike *Disbrow,* the *Pettingill* rule involves the scope of the privilege against self-incrimination, not a judicially created remedy, and therefore survives as a specifically exempted "statutory rule of evidence relating to privilege."

---

[5] *Pettingill* rejected the more permissive federal standard set out in *Mosley, supra,* 423 U.S. 96, as *Disbrow* had rejected the less stringent exclusionary rule announced in *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]. Indeed *Pettingill* also relied on *People* v. *Brisendine* (1975) 13 Cal.3d 528 [119 Cal.Rptr. 315, 531 P.2d 1099] which had excluded illegally obtained evidence on independent state grounds and was held to be abrogated by Proposition 8 in *In re Lance W., supra,* 37 Cal.3d 873. *May* adopted the rationale of *Lance W.*

*Pettingill,* like *Disbrow,* "neither concerned nor created any mere statutory privilege." (*People* v. *May, supra,* 44 Cal.3d at p. 319.) That *Pettingill* focused on whether there was a violation and *Disbrow* on the remedial device is immaterial. ■ As *May* pointed out, "it seems very likely that Proposition 8 was crafted for the very purpose . . . of abrogating cases such as *Disbrow,* which had elevated the procedural rights of the criminal defendant above the level required by the federal Constitution, as interpreted by the United States Supreme Court." (44 Cal.3d at p. 318.) *Pettingill* is just such a case. As *Pettingill* explicitly recognized, *Miranda* and its California progeny establish "procedural safeguards" (21 Cal.3d at p. 237; see also *Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706]). The judicially declared remedy for a *Miranda* violation is exclusion of evidence. (*People* v. *Pettingill, supra,* 21 Cal.3d at p. 237.)

"Given the probable aim of the . . . voters to dispense with exclusionary rules derived solely from the state Constitution, it is not reasonably likely that the California voters intended to preserve, in the form of a 'statutory' privilege, a judicially created exclusionary rule *expressly rejected* by the United States Supreme Court under the federal Constitution." (*People* v. *May, supra,* 44 Cal.3d at p. 318, original italics.) It is clear to us that the people did not intend to preserve California decisions construing the state constitutional privilege against self-incrimination to afford greater protection than that of the federal privilege under *Miranda* v. *Arizona, supra,* 384 U.S. 436 and its progeny. ■ In construing constitutional provisions created by initiative, the intent of the voters is the paramount consideration. (*In re Lance W., supra,* 37 Cal.3d at p. 889.) That intent to abrogate judicial decisions requiring the exclusion of evidence solely on state constitutional grounds would be frustrated were we to hold that the *Pettingill* rule survived merely because the Legislature had acknowledged the existence of judicial rules, such as *Pettingill* in statutes such as Evidence Code section 940. (*People* v. *May, supra,* 44 Cal.3d at p. 320.)

■ Defendant's reliance on *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789] for the continuing validity of *Pettingill* is misplaced. As *May* explained, *Ramona R.* is distinguishable on two grounds: it involved the use of legislatively compelled self-incriminatory statements or testimony in contrast to using statements merely violative of *Miranda*[6] and its rule of use immunity was adopted in the face of conflicting signals from the federal courts regarding the necessity of such a

---

[6]Because of the statutory rebuttable presumption of unfitness for juvenile court treatment of a 16-year-old minor charged with murder, Ramona would be penalized for failing to testify at the hearing and speak to the probation officer. In contrast, a defendant in a criminal trial cannot be penalized for invoking his *Miranda* rights and the prosecution bears the burden of proof.

remedy under the federal Constitution (*People* v. *May, supra,* 44 Cal.3d at pp. 317-318). We, therefore, disagree with *People* v. *Navarez* (1985) 169 Cal.App.3d 936 [215 Cal.Rptr. 519], and hold that the standard for the admissibility of statements, relating to crimes committed after the enactment of Proposition 8, given to police by a suspect who previously invoked his right to remain silent is that of federal constitutional law under the factual test of *Michigan* v. *Mosley, supra,* 423 U.S. 96.

## II

### EVIDENCE PROPERLY ADMITTED UNDER MOSLEY

Nor is there any merit to defendant's further contention that the confession was inadmissible under the federal standard of *Michigan* v. *Mosley, supra,* 423 U.S. at pages 105-106 [46 L.Ed.2d at pp. 322-323], because unlike in *Mosley* the second interrogation involved the same crimes.

The circumstances under which defendant's statements relating to count II were made meet the federal constitutional standards under the factual test of *Mosley.* On facts very similar to those herein, the United States Supreme Court held in *Mosley* that the requirement of *Miranda* that police interrogation must cease once the suspect in custody indicates a desire to remain silent, neither creates "a per se proscription of indefinite duration upon any further questioning by any police officer on any subject," nor imposes a blanket prohibition against the taking of voluntary statements regardless of the circumstances (423 U.S. at pp. 102-103 [46 L.Ed.2d at pp. 320-321]); and the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether the suspect's *Miranda* right to cut off the questioning was respected in the totality of the circumstances (*id.* at p. 104 [46 L.Ed.2d at pp. 321-322].). The court found that such a showing had been made, and identified several circumstances in support thereof (*id.* at p. 106 [46 L.Ed.2d at pp. 322-323]), circumstances comparable to those in the instant case which, in our view, meet the factual test of *Mosley.*

The record before us is remarkably free of any suggestion of police misconduct. Defendant did not testify at the hearing on the admissibility of his statements; but at trial, when he testified in his own behalf, although he denied committing any of the acts charged, even he did not accuse the officers of any misconduct simply stating that he confessed because he thought it was the best thing to do at the time thinking he could avoid the court system and obtain family counseling. It is undisputed that when defendant invoked his right to remain silent, "his 'right to cut off questioning' was 'scrupulously honored'" by Officer Pederson. (423 U.S. at p. 104

[46 L.Ed.2d at pp. 321-322], fn. omitted.) Officer Pederson immediately ceased all interrogation and tried neither to resume the discussion nor persuade defendant to reconsider his position. He simply ended the conversation. After an overnight interval (in *Mosley* the time interval was only two hours) defendant was interviewed by a plainclothes detective who was unaware he had invoked his constitutional right the day before and, having indicated his willingness to talk to Detective Gallon, was advised of his constitutional rights. Detective Gallon discussed with him his right to remain silent and his right to consult with and have a lawyer present; then defendant orally and in writing waived them. That defendant was fully aware of the seriousness of the crime is reflected in his statement the day before to Officer Pederson that "I'm in a great deal of trouble."

This is not a case in which there was any police imposition on defendant or defendant was tricked into changing his mind or he was rushed into making a decision. After his arrest and on the way to the police station, defendant expressed his uncertainty as to whether he wanted to talk to police. At that time advantage well could have been taken of defendant, but Officer Pederson would not let him talk, told him he could make up his mind later at the station, refused to give him any advice as to whether he should talk and when defendant was persistent, brought the conversation to a close. The record is devoid of even a hint that police at any time tried to "wear down" defendant's resistance, or "browbeat" him into submission, or used any form of force or coercion or threatened him or made promises to him, or resumed questioning only a short time after he had invoked his rights, or that there was any kind of collusion among the officers.

■ The circumstances are comparable to those in *Mosley* with one exception. In *Mosley*, the second interrogation related to an entirely different crime, a situation not unlike that in *People* v. *Pettingill, supra*, 23 Cal.3d 231. To our mind, the issue does not revolve around the fact the second interview of defendant was not for another separate crime. That is but one factor to be considered in applying the factual test of *Mosley*. Federal circuit court decisions, adhering to this flexible approach taking account of all relevant circumstances, have similarly held that an identity of subject matter in the first and second interrogations is not sufficient, in and of itself, to render the second interrogation unconstitutional. (See, e.g., *United States* v. *Udey* (8th Cir. 1984) 748 F.2d 1231, 1242 ["this factor alone is not sufficient to find a violation"]; *United States* v. *Finch* (8th Cir. 1977) 557 F.2d 1234, 1236, cert. denied, 434 U.S. 927 [54 L.Ed.2d 285, 98 S.Ct. 409]; *United States of America* v. *Hsu* (9th Cir. 1988) 852 F.2d 407, 410; *Grooms* v. *Keeney* (9th Cir. 1987) 826 F.2d 883, 885-886.)

The real issue is whether defendant's *Miranda* right to cut off the questioning was respected in the totality of the circumstances, and we find that it was. Defendant's decision to talk to Detective Gallon did not necessarily imply a change of mind but, rather, considering his prior indecisiveness, that after thinking it over he made up his mind to talk to Detective Gallon. Defendant had plenty of time to think about his predicament, there having been passage of a substantial period of time since he had invoked his right to remain silent—this in contrast with the short two-hour interval in *Mosley*.

Where, as here there is no evidence of police misconduct and police immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, we conclude that the circumstances meet the factual test of *Mosley*. Accordingly, the trial court properly admitted statements relating to acts occurring after June 9, 1982 (count II).

### DISPOSITION

The judgment is affirmed.

Johnson, J., and Kolts, J.,* concurred.

Appellant's petition for a rehearing was denied December 8, 1988. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

* Assigned by the Chairperson of the Judicial Council.