[No. A040550. First Dist., Div. Four. June 19, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY LEE HARRIS, Defendant and Appellant.

642

COUNSEL

John Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Laurence K. Sullivan and Linda James, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ANDERSON, P. J.**—Defendant Terry Lee Harris (appellant) stands convicted by jury of first degree murder. On appeal he challenges the admission of postarrest statements made to law enforcement officials after exercising his right to remain silent. We conclude that appellant's first statement was inadmissible under the factual standard articulated in *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], that once a suspect has asserted his *Miranda*[1] right to remain silent, the interrogating officer must scrupulously honor this request. Accordingly, we reverse.[2]

## I. *Facts*

In the early morning hours of June 5, 1986, Jim Sternbergh, appellant's roommate, beat fellow roommate Paul Lang to death with a claw hammer in the living room of the apartment all three shared at 1329 Santa Fe Avenue, Apartment B, Martinez. Appellant held Lang's hands down after Lang started to raise them, releasing his hands when they turned limp. According to the testimony of friends and acquaintances of the roommates, there were tensions between appellant and Sternbergh on one side and Lang on the other over small things such as housecleaning and dishes.

There were also problems between Lang and Sternbergh over a mutual girlfriend, Kristie Hill. She had dated Lang and, more recently, Sternbergh. Hill became pregnant; she believed Sternbergh was the baby's father. Sternbergh mentioned to her that Lang said the baby was his (Lang's). About three weeks before Lang's death, Sternbergh told her he wanted to kill Lang and dump his body off Snake Road. Appellant heard the statement and responded, "Yeah, yeah, I'll help."

Appellant gave lengthy statements to Sgt. Ward and Lt. Poole of the Contra Costa County Sheriff's Department on June 10 and June 12. He recalled that he and Sternbergh had been talking about "doin' it" for a couple of days but did not have the opportunity until that night. Sternbergh acquired a hammer because he heard that it wouldn't leave much blood.[3]

That night Sternbergh woke up appellant and announced "we were gonna do it." Lang was asleep on the couch. Sternbergh hit Lang on the head with the hammer. Lang made a noise like he was having a bad dream and started to put his hands up. Appellant grabbed his hands and held them

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[2] In light of our reversal on the *Miranda* issue, we decline to discuss appellant's additional allegations of error.

[3] At trial Don Fletcher, a mutual friend of the roommates, testified that Sternbergh borrowed a claw hammer from him the week Lang died.

down while Sternbergh continued to hit him "maybe 15, 16" times. He released Lang's hands when they went limp. Several pieces of Lang's skull fell to the floor. Appellant picked up a few pieces, put them in an ashtray and then threw the ashtray away. Appellant denied ever striking Lang; nor did he try to stop Sternbergh.

They then wrapped Lang in some sheets. Sternbergh went to get his friend, Scott Trueblood, and they returned to the apartment with Trueblood's truck. Before admitting his actual involvement with the slaying, appellant admitted that he helped dispose of Lang's body. Apparently Sternbergh slid Lang through the window to appellant.[4] Appellant then helped carry Lang's body to Trueblood's pickup, and all three of them drove to the Snake Road area. En route to Trueblood's house they stopped by the apartment. Sternbergh told Trueblood he could have something of Lang's; Trueblood took a shotgun. They returned to Trueblood's house, cleaned up the truck, and then Sternbergh and appellant went home.[5]

Appellant said they decided to kill Lang because they "were fed up with Paul. He just . . . everytime he came home he was always hollerin' about something . . . ." Sternbergh and appellant thought Lang had unhooked the spark plugs to Sternbergh's motorcycle. Sternbergh then got real mad and "beat the crap out of Paul's two cars . . . ." Lang threatened to sue appellant and have his motorcycle "taken away . . . and so we just decided that it had to get done . . . that we had to kill him."

On the afternoon of June 5 employees of Tempco Services discovered Lang's body buried in a shallow creek bed near Carquinez Scenic Road. Dr. Daugherty performed an autopsy on Lang's body, identifying the cause of death as traumatic head injuries. He observed extensive recent injuries around the face and head area consisting of multiple areas of swelling, bruising and lacerations which appeared to be caused by a blunt instrument.

Sgt. Ward and Lt. Poole initially interviewed appellant on June 6, the day after the murder; he denied any knowledge of what happened to Lang. Appellant and Sternbergh left town and spoke with Lt. Poole by telephone

---

[4] At trial a neighbor living in a nearby upstairs apartment testified that on the evening of June 4 between 11:30 p.m. and midnight she heard music blasting, someone moaning, and a slamming noise. A short time later she heard at least two people talking in hushed tones. She also heard a window open, the sound of something being transferred out the window, and finally a vehicle driving off. Analysis of palm prints lifted from outside of the north bedroom window revealed that these prints were appellant's; another print lifted from the interior of the window belonged to Sternbergh. A criminalist located blood on the exterior window frame.

[5] Pursuant to a search warrant, sheriff's officials searched Trueblood's home. They seized a shotgun, a butterfly knife, two shovels and a hammer, and impounded Trueblood's truck. There was visible blood in four areas of the truck including the shell door. The swab taken from the door tested positively for human blood.

on June 8. Appellant indicated he was running because he was frightened of being arrested for a murder he did not commit. Lt. Poole told appellant that if he did not commit the murder he had nothing to worry about, "but it was necessary for him to come back and get it straightened out." Appellant told Lt. Poole they would come back. They did, and sheriff's officials arrested appellant and Sternbergh in the apartment on the evening of June 10.

Prior to the arrest two criminalists processed the apartment, locating blood throughout. The swab collected from the living room contained human blood that could have been shed by the victim but not by appellant, Sternbergh or Trueblood.

### The Defense

Appellant did not testify.

Psychiatrist Gloria Bentinck testified that she performed a psychiatric evaluation of appellant at the request of defense counsel. Appellant reported to her that he had taken three hits of LSD at about 9:15 p.m. on the night of the killing. When Sternbergh woke him up around 1 a.m., he realized he was feeling the effects of the LSD. He said his vision was blurry and rather tunneled. He felt as if in a dream, kind of groggy and fuzzy. He asked Sternbergh to let him sleep a little longer, and when he woke up the second time he reported "responding rather mechanically, still feeling in a dream, kind of fuzzy, unable to, as he claims, really quite comprehend the situation was real . . . ." In Dr. Bentinck's opinion, at the time of the killing appellant was suffering from the effects of LSD either in the form of an acute brain syndrome or an intoxication. She further explained that the symptoms he described were compatible with ingestion of three hits of LSD.

Dr. Bentinck was aware that appellant told the police that he had not taken any drugs that night. She acknowledged on cross-examination that her opinion concerning his drug-induced mental condition might be different if appellant had lied to her and had not ingested drugs that evening. However, because of his total consistency over the interview period and his unsophisticated nature, she was of the opinion that he was telling her the truth.

### II. Admissibility of Appellant's Statements

#### A. Factual Background

At 6:24 p.m. on June 10, Sgt. Ward, with Lt. Poole also present, admonished appellant per *Miranda*. When asked if he wished to talk with them, appellant replied, "Not really." Ward terminated the interview at 6:25 p.m., turned off the tape recorder, and had appellant indicate "No" on the writ-

ten waiver form. Lt. Poole left the room. Ward gathered his notebook and tape recorder, stood up, and told appellant he would be taken across the street and booked for murder. Sgt. Ward related that appellant seemed surprised and shocked. Ward then said, " 'I thought you were going to come back and straighten it out.' " As Ward moved toward the door to leave, appellant acknowledged that he did wish to do this, whereupon, Ward responded that he could not talk with appellant anymore because he had exercised his rights. In response appellant told Ward he was scared and wanted to talk with him. But he also indicated that his parents told him they were going to hire a lawyer and not to talk to anyone until that time.

Sgt. Ward left the room. He testified at the suppression hearing that as he stood outside the interview room, he formed the impression that appellant wanted to talk to him. Ward also believed appellant, who was 18 at the time, was doing what his parents told him to do. On cross-examination Ward stated at that point he was not sure if appellant was "clearly waiving" his rights, invoking them, or acting under his parents' orders. Ward told Lt. Poole, "Let's go back in the room, I think he wants to talk to us." They returned, turned on the tape recorder at 6:26 p.m., and Ward said to appellant: "Okay, Terry you indicated to me that you might be wanting to change your mind and talk. . . [¶] Is that true or not?" Appellant responded, "Yes," and Ward again reminded him that two minutes earlier he had read appellant his rights and asked him if he understood those rights, to which appellant again answered "Yes." Ward also went to great lengths to assure, to the extent verbally possible, that appellant was expressing his own voluntary decision to talk.

Appellant then proceeded to confess to helping Sternbergh dispose of Lang's body. Two days later on June 12, Sgt. Ward and Lt. Poole again met with appellant, informed him of his rights, and appellant consented to further questioning. This time he admitted his participation in the murder itself.

Appellant insists both confessions should have been suppressed—the first as a violation of the principles announced in *Mosley* and the second as the tainted product of the first.

### B.   *The First (June 10) Confession*

■ In *Miranda,* the Supreme Court ruled that once the individual in custody has been notified of his rights and subsequently elects to remain silent, "the interrogation must cease." (*Miranda, supra,* 384 U.S. at pp. 473-474 [16 L.Ed.2d at p. 723].) The court later avoided literal interpretations of this passage, pointing out the absurd results on the one hand of permitting continued interrogation after a momentary cessation and on the other ex-

treme of uniformly prohibiting the taking of voluntary statements or permanently immunizing the suspect from further questioning irrespective of the circumstances. (*Mosley, supra,* 423 U.S. at p. 102 [46 L.Ed.2d at p. 320].) Rejecting a per se proscription of indefinite duration against further questioning by any officer on any subject, the court instead adopted a case by case approach, concluding that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" (*Id.* at p. 104 [46 L.Ed.2d at p. 321].)

In *Mosley,* the defendant asserted his right to silence in connection with questioning about certain robberies; the interrogation ceased immediately. The court found no *Miranda* violation when, approximately two hours later, the *Miranda* warnings were given at the outset of a second interrogation conducted at another location by a different officer about an unrelated crime. (*Mosley, supra,* 423 U.S. at pp. 104-105 [46 L.Ed.2d at pp. 321-322].)

■ Consistent with the purposes and terms of the "Truth-in-Evidence" provision of Proposition 8,[6] the federal standard announced in *Mosley* now exclusively governs admissibility of a suspect's statements following assertion of his or her right to remain silent. (*People* v. *Warner* (1988) 203 Cal.App.3d 1122, 1129 [250 Cal.Rptr. 462].) In *Warner,* the defendant, after receiving the *Miranda* warnings, chose to remain silent. The arresting officer immediately ceased questioning. The next day another officer, unaware that the defendant had previously invoked his rights, administered a new set of warnings, and obtained written and oral waivers. Thereafter, defendant spoke with the officer about the incident in question. The reviewing court concluded that the identity of the subject matter in the first and second interrogations does not of itself render the second interrogation unconstitutional. Under the totality of the circumstances, the defendant's rights were preserved. There was no evidence of police misconduct, the arresting officer scrupulously respected defendant's right to remain silent and the second officer, after an overnight interval, resumed questioning after a fresh set of warnings. (*Id.,* at pp. 1129-1131.)

Unlike *Mosley* and *Warner,* the same officer herein resumed questioning only one minute after the first discussion ended. We focus on the exchanges that occurred between 6:25 p.m. and 6:26 p.m. to ascertain whether Sgt. Ward scrupulously honored appellant's request not to talk. First, we note that Ward's booking remark was nothing more than a factual statement

---

[6] Article I, section 28, subdivision (d) of the California Constitution, which reads in relevant part: "[R]elevant evidence shall not be excluded in any criminal proceeding . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay . . . ."

about the immediate next step in the criminal justice process and cannot be considered as reopening the dialogue or reinitiating interrogation.

We are more troubled by what happened thereafter. Although appellant did not verbally respond to the booking remark, he registered a look of shock and surprise. The look, directed at Ward, triggered Ward's further comment about coming back to straighten matters out. Under the circumstances, it appears Sgt. Ward was responding to appellant's reaction and further clarifying the decision to book him for murder. Appellant had previously relayed to Lt. Poole via telephone that he intended to return to clear up the matter. Obviously, had he carried out this plan, he very well might not have been booked for murder.

The trial court found that Sgt. Ward's comment did not amount to interrogation because it was not reasonably likely to elicit an incriminating response, and further found that "the police did not in any way initiate the statements of appellant, the statements were freely and voluntarily made after the proper Miranda warning." ■ The *Miranda* safeguards come into play when a person is subject to custodial interrogation. The term "interrogation" refers not only to express questioning, "but also by any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682], fns. omitted.)

Relying upon this language our Supreme Court has just recently held that "forbidden renewed 'interrogation' includes both direct questioning and its 'functional equivalent.'" (*People* v. *Boyer* (1989) 48 Cal.3d 247, 273, mod. at 48 Cal.3d 972a [256 Cal.Rptr. 96, 768 P.2d 610].) In *Boyer* the Supreme Court held that the defendant's confession ("I did it") was the result of the authorities' improper resumption of contact and questioning when, after the suspect had vehemently maintained his innocence and invoked his *Miranda* rights to silence and counsel, he was marched off to fingerprinting, allowed a phone call, returned to the interrogation room, and subjected to a monologue by the investigating officer on the status of the investigation. The court emphasized therein that there was no evidence that the defendant sought to discuss the case further with the authorities.

■ While admittedly a difficult question, we believe the trial court reached the wrong conclusion; just as in *Boyer* there is no evidence here that appellant sought to discuss the case further, and we believe Sgt. Ward's comment, "I thought you were going to come back and straighten it out," must be deemed the "functional equivalent" of further questioning. Certainly, Sgt. Ward's comment is understandable, particularly in light of his

previous telephone communication with appellant. But the issue here is whether Sgt. Ward should have known his remark was likely to draw damaging statements from appellant. We think it is reasonably foreseeable that a suspect would react to Ward's statement as a prodding invitation to further discussion about the incident. And, if the suspect were culpable, the prod easily could lead to admissions, which is just what happened here. Sgt. Ward's comment had the effect of loosening appellant's tongue. Confronted with an offer to "straighten it out," appellant wanted to talk, but was also scared. Had Ward scrupulously respected appellant's right to remain silent, he would not have encouraged further conversation about the murder. This same reasoning compels us to disagree with the trial court's conclusion that appellant freely and voluntarily *initiated* the second interview, one minute after he unequivocally stated he did not want to talk.

The People argue that Sgt. Ward's statement was a proper attempt to clarify whether appellant intended to waive his constitutional rights. (See *People* v. *Pack* (1988) 201 Cal.App.3d 679, 690-691 [248 Cal.Rptr. 240] [police may clarify with suspect whether he understands the questions relating to his constitutional rights and whether by his answers he intends to waive them].) But here there was nothing ambiguous about appellant's *initial* assertion of his right to remain silent. Thus, there was nothing for Sgt. Ward to clarify, even though appellant's decision not to talk may have perplexed Sgt. Ward because of appellant's earlier promise of cooperation. That Sgt. Ward himself was convinced appellant had invoked his right to remain silent is evident by his own actions: (1) he terminated the interview when appellant indicated he did "not really" want to talk, and (2) he then had appellant sign "No" next to the appropriate box on the admonishment form. Appellant's equivocation came later in response to Ward's *subsequent* invitation, a prod that can only be viewed under the circumstances as reasonably likely to chip away at appellant's resolve to remain silent and thereby to dishonor his Fifth Amendment privilege against compulsory self-incrimination. These facts compel the conclusion that the trial court erred in admitting the June 10 confession.

### C. *The Second (June 12) Confession*

██ We next consider appellant's contention that the subsequent and still more incriminating June 12 statement should have been suppressed as the tainted byproduct of the original, unlawfully obtained confession. ██ Preliminarily we note that "the line of California cases, which hold that a noncoerced, 'non-Mirandized' confession presumptively taints a subsequent noncoerced, 'Mirandized' confession, is no longer viable under the California Supreme Court's recent decision in *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307]." (*People* v. *Gastile* (1988) 205 Cal.App.3d 1376, 1385 [253 Cal.Rptr. 283].) Similar to the facts before us,

*Gastile* affirmed the trial court's admission of a properly Mirandized full confession even though an hour before confessing the defendant, without the benefit of *Miranda* warnings, had stated the girls were dead and had directed the officer to their bodies.[7] We agree with the reasoning of the *Gastile* court that federal, not California, law governs the scope of exclusion for *Miranda* violations: "As California courts may not extend the *Miranda* exclusionary rule beyond that stated by the United States Supreme Court [citation], it follows that we are bound by the decision in *Elstad,* rather than the more liberal exclusionary rule stated in *Pablo C.*" (*Id.* at p. 1386.)

We next examine that federal law. In *Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285], the United States Supreme Court held that the initial failure of law enforcement to administer *Miranda* warnings did not taint later admissions made after the suspect had been "Mirandized" and elected to waive his rights. Elstad made incriminating statements when arrested at his home, prior to admonishment per *Miranda*. At the station house, Elstad executed a written confession after the police advised him of his *Miranda* rights. The trial court excluded the first statement but admitted the written statement.

The United States Supreme Court affirmed, declining to suppress the subsequent confession as the tainted fruit of the poisonous tree[8] of the first non-*Miranda* admission. (*Oregon* v. *Elstad, supra,* 470 U.S. at pp. 306-308 [84 L.Ed.2d at pp. 230-232].) ▪ *Elstad* seems to draw a distinction between a *Miranda* violation of the Fifth Amendment and a confession coerced in violation of the Fourteenth: "A *Miranda* violation does not *constitute* coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." (*Oregon* v. *Elstad, supra,* 470 U.S. 298, 307, fn. 1 [84 L.Ed. 222, 231], italics in original.)

The question now becomes whether this June 10 "presumption of coercion" rendered the June 12 confession involuntary. In holding that the second confession in *Elstad* was not tainted the court rejected the notion that the failure to administer *Miranda* warnings "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 309 [84 L.Ed.2d at p. 232].) *Elstad* teaches that in those circumstances the admissibility of the subsequent statement turns solely on the question of "whether it is knowingly and voluntarily made." (*Ibid.*)

---

[7] Those prior statements, unlike the situation here, were excluded by the trial court.

[8] This metaphor derives from *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407], wherein the court held that evidence discovered as a result of an illegal search must be excluded as fruit of the poisonous tree.

Is a different test indicated here because in *Elstad* the prior statement was inadmissible because *no* warnings were given when here the prior statement is inadmissible because the defendant's invocation of his right to silence was not respected? We think not. The United States Supreme Court has found no valid distinction between a defective warning and a proper one whose negative response is not heeded. (See *Oregon* v. *Hass* (1974) 420 U.S. 714, 722 [43 L.Ed.2d 570, 577-578, 95 S.Ct. 1215].)

It refused to draw such a distinction when considering whether such statements (admittedly not admissible in the prosecutor's case in chief) would be admissible in rebuttal for impeachment purposes: "The shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances. [¶] We are, after all, always engaged in a search for truth in a criminal case so long as the search is surrounded with the safeguards provided by our Constitution." (*Oregon* v. *Hass, supra,* 420 U.S. at p. 722 [43 L.Ed.2d at pp. 577-578].) *Hass* was concerned with admissions made after the defendant had invoked his right to an attorney, and the Supreme Court held *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] applicable—a case concerned with statements elicited after a defective *Miranda* warning.

In *Elstad,* unlike the situation before us, the trial court had ruled inadmissible the first statement ("I was there"), which was given without benefit of *Miranda* warnings. It then rejected the defendant's contention that the second written confession should likewise be excluded because the earlier questioning "let the cat out of the bag" (*United States* v. *Bayer* (1946) 331 U.S. 532, 540 [91 L.Ed. 1654, 1660, 67 S.Ct. 1394]) and tainted the subsequent confession as "fruit of the poisonous tree." (*Wong Sun* v. *United States, supra,* 371 U.S. 471.) The court specifically found as follows: " '[H]is written statement was given freely, voluntarily and knowingly by the defendant after he had waived his right to remain silent and have counsel present which waiver was evidenced by the card which the defendant had signed. [It] was not tainted in any way by the previous brief statement between the defendant and the Sheriff's Deputies that had arrested him.' " (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 302 [84 L.Ed.2d at pp. 227-228].)

In upholding the trial court's ruling, the United States Supreme Court specifically rejected the Oregon Court of Appeals' identification of the crucial constitutional inquiry (when it reversed the trial court) as " 'whether there was a sufficient break in the stream of events between [the] inadmissible statement and the written confession to insulate the latter statement from the effect of what went before.' " (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 303 [84 L.Ed.2d at p. 228].) On the contrary, *Elstad* directs courts in such situations to avoid establishing a rigid rule: "[T]here is no warrant for

presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 318 [84 L.Ed.2d at p. 238], fn. omitted.) Without such an inquiry we cannot conclude as appellant urges that "the coercive effect of the prior June 10 confession" necessarily taints the June 12 confession and renders it inadmissible as well.

### Conclusion

Because the June 10th statement was erroneously admitted into evidence the cause is reversed and remanded for a new trial. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) On retrial if the June 12 statement is offered into evidence, the trial court is directed to determine its admissibility pursuant to *Elstad.*

Channell, J., and Perley, J., concurred.

Repondent's petition for review by the Supreme Court was denied September 28, 1989.