Filed 10/19/21  P. v. Thomas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STERLING WAYNE THOMAS,<br><br>Defendant and Appellant. | F079202<br><br>(Super. Ct. No. F17903402)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Rachelle Newcomb, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Franson, Acting P. J., Snauffer, J. and DeSantos, J.

## THE COURT

Appellant Sterling Wayne Thomas was convicted by jury of assault with a semiautomatic firearm (Pen. Code,[1] § 245, subd. (b)). The jury also found true an enhancement alleging Thomas had personally used a firearm in the commission of the offense (§ 12022.5, subd. (a)). He was sentenced to a term of 6 years in state prison. On appeal, Thomas contends the trial court erred by failing to suppress statements he made to police in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We affirm.

## PROCEDURAL HISTORY

On November 9, 2017, the Fresno County District Attorney's Office filed an information charging Thomas with assault with a semiautomatic firearm (§ 245, subd. (b)). The information further alleged Thomas had personally used a firearm in the commission of the offense (§ 12022.5, subd. (a)).

On January 2, 2019, at a pretrial hearing, the trial court ruled that post-*Miranda* statements made by Thomas during his interrogation were inadmissible because Thomas had invoked his right to remain silent.

On January 3, 2019, the prosecutor filed a motion for reconsideration of the trial court's ruling. Defense counsel filed an opposition to the People's motion.

On January 7, 2019, after consideration of the parties' motions, the trial court reversed its prior ruling and held Thomas's statements were admissible.

On January 10, 2019, Thomas was convicted by jury of the charged offense and the firearm enhancement allegation was found true.

On April 12, 2019, Thomas was sentenced to an aggregate term of six years in state prison.

On April 26, 2019, Thomas filed a timely notice of appeal.

---

**1**    All undefined statutory citations are to the Penal Code unless otherwise indicated.

STATEMENT OF FACTS

**The Trial**

*Prosecution's Case*

On May 30, 2017 at approximately 8:00 p.m., Thomas invited Jason Broyles into his home to play video games and drink alcoholic beverages. Thomas and Broyles were acquaintances and neighbors.

During the course of the evening, Broyles and Thomas had several drinks and consumed marijuana. As Thomas became intoxicated, he became aggressive. Following a heated discussion over prison politics, a verbal altercation ensued between Broyles and Thomas. As Broyles was speaking with Thomas's mother, he heard Thomas yell, " 'I'm going to f-ing kill you.' " When Broyles turned to look at Thomas, he observed Thomas pointing a .25-caliber semiautomatic handgun at him. Broyles threw up his hands up and asked Thomas what he was doing. Thomas shot Broyles in the arm.

*Defense's Case*

Thomas's mother Deborah, with whom Thomas lived at the time of the shooting, testified at trial. Deborah claimed Broyles was preparing to leave the home around 10:00 p.m. when Thomas told Broyles, " 'Don't ever disrespect my mom.' " Thomas was pointing a gun at Broyles.

Deborah told Thomas to put the gun down. Thomas lowered the gun but kept it by his side. Broyles and Thomas stared at one another for several minutes. Deborah told Broyles, " 'Leave, go home.' " Broyles turned toward the door to leave. Suddenly, he turned back around and charged at Thomas, causing the gun to discharge.

**The Interrogation**

*Thomas's Statements to Detectives*

Following the shooting, Thomas was handcuffed and escorted to the Fresno Police Department for questioning. While waiting in an interview room, Crime Scene Technician Alyssa Vargas took photographs of Thomas and swabbed his hands for

3.

gunshot residue (GSR).[2]  During the course of the procedure, Thomas made unprompted statements concerning the shooting.

After approximately 10 minutes, Detective Clement and Detective Soto entered the interview room.  The following exchange occurred:

> "[DETECTIVE CLEMENT]:  Hey, uh, I appreciate you comin' down here.  Uh, I'm gonna read [you] your rights.

> "[THOMAS]:  Well, like I told this guy, uh, you know, I didn't have no problem when he said, you know, 'Come down, come down,' because there was a problem.  And I thought my mom was the one that called the police so [that's] why I came down here was the situation.

> "[DETECTIVE CLEMENT]:  Okay.  Well I'm gonna read your rights real quick 'cause we did bring you down here in handcuffs and all that other stuff.  So just gonna cover everything.  Doesn't mean you're being charged with anything.  [¶ … ¶]

> "[THOMAS]:  You just gotta get through the formalities.

> "[DETECTIVE CLEMENT]:  Exactly. So …

> "[THOMAS]:  Which you guys haven't done yet which I could actually call my lawyer, uh, which you guys didn't give me the process to do.

> "[DETECTIVE CLEMENT]:  Well …

> "[THOMAS]:  All right. I'm listenin'.  I'm listenin'.

> "[DETECTIVE CLEMENT]:  [L]et me read [you] your rights.  You have the right to remain silent.  Anything you say can and may be used against you in court.  You have the right to talk to a lawyer and have him present with you while you're being questioned.  If you cannot afford to hire a lawyer one will be appointed to represent you upon questioning if you wish.  You understand these rights I read to you?

> "[THOMAS]:  Yes sir.

---

[2]    The GSR sample was not subsequently tested by the Department of Justice because there was no question that Thomas had fired a gun.

4.

"[DETECTIVE CLEMENT]: All right. Havin' those rights in mind you wanna talk to me about what happened tonight?

"[THOMAS]: Not really.

"[DETECTIVE CLEMENT]: You don't wanna talk to me?

"[THOMAS]: Not really, I mean, it was a bad night. I mean, … I really don't remember much. I smoked a shit-load of wax. I have a marijuana card so …

"[DETECTIVE CLEMENT]: Okay.

"[THOMAS]: I was kinda fucked up. And then I know what happened which was my neighbor tried to attack me and my mother.

"[DETECTIVE CLEMENT]: Okay.

"[THOMAS]: And then I blacked out. And next thing you know I'm bein' arrested. It's all I gotta say.

"[DETECTIVE CLEMENT]: Okay. Uh …

"[THOMAS]: And it's not the first time he's tried to attack people.

"[DETECTIVE CLEMENT]: Okay.

"[THOMAS]: And he came at me and my mother. I blacked out. And the next thing you know I'm in handcuffs and I'm wonderin' why he wasn't in handcuffs.

"[DETECTIVE CLEMENT]: Uh, you don't remember any of this? You don't remember what happened?

"[THOMAS]: I remember that I was outside my house. I was waterin' my front yard."

### *The Pretrial Hearing & Motion for Reconsideration*

On January 2, 2019, at a pretrial hearing (Evid. Code, § 402), the prosecutor asked defense counsel to stipulate to the admissibility of all statements after Thomas was admonished pursuant to *Miranda*. The prosecutor explained she would redact any statements made before the *Miranda* warnings had been given. Defense counsel declined

5.

and lodged a general objection to the admission of any portion of the recorded interrogation.

The trial court held Thomas's post-*Miranda* statements were inadmissible, based upon the following exchange:

"[DETECTIVE CLEMENT]: 'All right. Having those rights in mind, do you want to talk to me about what happened tonight?

"[THOMAS]: 'Not really.'

"[DETECTIVE CLEMENT]: 'You don't want to talk to me?'

"[THOMAS]: 'Not really. It was a bad night. I mean, I really don't remember much. I smoked a shit-load of wax. I have a marijuana card, so.' "

According to the trial court, Thomas's statements did not represent a valid waiver of his right to remain silent. The trial court added that while Thomas's post-*Miranda* statements were not admissible, they could still be used for impeachment purposes.

On January 3, 2019, the prosecutor filed a motion for reconsideration of the trial court's ruling. According to the prosecutor, Thomas did not unambiguously invoke his *Miranda* rights during the interrogation. Defense counsel filed a motion in opposition.

Following argument by the parties, the trial court reversed its previous ruling and held Thomas's statements were admissible. The trial court analyzed the interrogation in two parts.

The first part of the interrogation occurred when the crime scene technician took Thomas's photographs and collected a gunshot residue sample from Thomas. While this interaction occurred within a custodial setting, Thomas's statements during this portion of the interrogation were voluntary and unprompted by questioning from law enforcement. The trial court further observed that statements made during the booking process are not generally subject to *Miranda*. This portion of the interrogation was analogous to the booking process. Thomas's unsolicited statements during this portion of the interrogation were therefore admissible.

The second portion of the interrogation occurred when Detective Clement and Detective Soto began questioning Thomas. Almost immediately after Detective Clement entered the interview room, he told Thomas he was going to admonish him of his *Miranda* rights. Thomas replied, "Which you guys haven't done yet which I could actually call my lawyer, uh, which you guys didn't give me the process to do." This statement—which was never followed by a clear and unambiguous invocation of Thomas's right to counsel—demonstrated that Thomas understood his rights. Thomas reaffirmed that he understood his rights after Detective Clement provided a complete *Miranda* advisement, and asked Thomas whether he understood his rights. Thomas responded clearly and unequivocally, " 'Yes sir.' "

When Detective Clement asked Thomas whether he wanted to speak with him, Thomas responded, " 'Not really.' " According to the trial court, Thomas's response was ambiguous. When Detective Clement asked Thomas, " 'You don't wanna talk to me?' " he was attempting to clarify Thomas's response. Thomas replied, "Not really, I mean, it was a bad night. I mean, … I really don't remember much. I smoked a shit-load of wax. I have a marijuana card so …" Thomas proceeds to make a series of statements to Detective Clement concerning the shooting. Thomas's statements were not in response to questioning or interrogation. He began to voluntarily discuss the shooting, and at no point thereafter did he make any attempt to invoke his *Miranda* rights. Thomas's statements were therefore admissible.

At trial, a recording of Thomas's confession was played for the jury. Defense counsel did not lodge a timely and specific objection when this evidence was offered.

## DISCUSSION

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374.)

In *Miranda,* the United States Supreme Court held that to protect the federal constitutional right against self-incrimination, "any person who is suspected or accused of a crime and who has been taken into custody or otherwise restrained may not be interrogated by the police unless he [or she] first knowingly and intelligently waives his [or her] right to silence, to the presence of an attorney, and to appointed counsel if indigent." (*People v. Ray* (1996) 13 Cal.4th 313, 336.)

"The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions. Any waiver, express or implied, may be contradicted by an invocation at any time. If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 387-388.)

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or counsel. [Citation.] It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda, supra,* 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*).)

The accused must therefore "articulate his desire to [remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an invocation of the right to remain silent]." (*Davis v. United States* (1994) 512 U.S. 452, 459; *Berghuis v. Thompkins, supra,* 560 U.S. at p. 381.) A reviewing court may look to the conduct of the accused "before, during, and after the statements" (*People v. Jennings* (1988) 46 Cal.3d 963, 978-979), to determine what " ' "a reasonable officer in light of the circumstances would have understood" ' " the accused's statements to mean. (*People v. Sanchez* (2019) 7 Cal.5th 14, 49 (*Sanchez*).)

In reviewing *Miranda* claims, we accept the trial court's resolution of disputed facts and evaluations of credibility if supported by substantial evidence (*People v. Enraca* (2012) 53 Cal.4th 735, 753), " 'but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269.)

In the instant case, Thomas does not challenge the admissibility of statements he made during the first part of his interrogation, when he was photographed and had gunshot residue samples taken. In any event, we find no constitutional infirmity with respect to the admission of these statements.[3] Our analysis is therefore constrained to the second part of Thomas's interrogation, where he was *Mirandized* and asked questions about the shooting.

Following our independent review of the recorded interrogation and the accompanying transcript, we conclude Thomas did not unambiguously assert his right to remain silent—either at the outset of the interrogation or at any point thereafter—and that he implicitly waived his *Miranda* right by speaking with Detective Clement after being informed of and expressly indicating an understanding of his *Miranda* rights.

After Detective Clement admonished Thomas of his *Miranda* rights, he confirmed Thomas had understood his rights. Detective Clement then asked Thomas, "Havin' those rights in mind you wanna talk to me about what happened tonight?" Thomas replied, "Not really." Contrary to Thomas's assertion, this was an ambiguous response. Although Detective Clement was not constitutionally required to do so (*Stitely*, *supra*, 35

---

**3** Thomas was clearly in a custodial setting even though he had not yet been arrested. His interrogation was imminent, and as such, he was entitled to invoke *Miranda's* protections. (*People v. Nguyen* (2005) 132 Cal.App.4th 350, 357.) He did not do so. At the same time, Thomas was not asked any questions by the crime scene technician that were reasonably likely to elicit an incriminating response. All of the statements he made during this portion of his interrogation were voluntary, unprompted, and offered in the course of routine procedures conducted by the crime scene technician.

Cal.4th at p. 535), he gave Thomas a chance to clarify his response by asking, "You don't wanna talk to me?" Thomas replied, "Not really, I mean, it was a bad night. I mean, … I really don't remember much. I smoked a shit-load of wax. I have a marijuana card so …"

If viewed in isolation, Thomas's responses appear to support his claim that he invoked his right to remain silent. However, a different picture emerges when Thomas's statements are considered in light of the full transcript and the recording of his interrogation.

Immediately after Thomas stated he did "[n]ot really" want to talk to Detective Clement, he made a series of unsolicited statements about the shooting. Detective Clement replied, "Okay" to Thomas's statements, but he did not pose any questions to Thomas. By the time Detective Clement asked Thomas, "[Y]ou don't remember any of this? You don't remember what happened?" it had become clear that Thomas wanted to discuss the shooting and that he was not invoking his right to remain silent. Thomas's assertions to the contrary are unpersuasive in light of the full context of the record.

We further observe that Thomas's demeanor appeared relaxed throughout the interrogation. Although Thomas claimed he had smoked copious amounts of marijuana wax, he spoke clearly, he was attentive, and he appeared eager to offer his version of events. Consistent with the trial court's ruling, he did not appear to be under the influence of any substances which may have impaired his ability to understand the *Miranda* advisement given, or the right he was waiving by continuing to discuss the shooting. Nor does he argue as much.

Nothing in Thomas's behavior, demeanor, or statements communicated an unambiguous and unequivocal desire to invoke his right to remain silent. Thomas repeatedly discussed the shooting, without prompting, even after he had purportedly invoked his right to remain silent. Understood in context, a reasonable listener would not

10.

have understood Thomas's statements as an invocation to invoke his right to remain silent.

Relying upon *People v. Harris* (1989) 211 Cal.App.3d 640 (*Harris*), Thomas contends his reply of "Not really," when asked whether he wanted to speak to Detective Clement, was a clear invocation of his rights under *Miranda*. Thomas's reliance upon *Harris* is unpersuasive.

In *Harris*, several days after Harris's roommate was murdered, an investigating officer contacted Harris and persuaded him to come back into town and straighten things out. (*Harris, supra,* 211 Cal.App.3d at pp. 645.) After Harris was advised of his *Miranda* rights, interrogating officers asked him if he wanted to talk. Harris responded, " 'Not really.' " (*Ibid*.) One of the interrogating officers terminated the interview, turned off the tape recorder, and had Harris indicate " 'No' " on a written waiver form. (*Id*. at pp. 645-646.) As the interrogating officer prepared to leave, he told Harris he would be booked for murder. (*Id*. at p. 646.) Harris appeared shocked. The interrogating officer told Harris, " ' "I thought you were going to come back and straighten it out." ' " Harris subsequently confessed to helping his friend dispose of his roommate's body. (*Ibid*.)

The appellate court held Harris's initial assertion of his right to remain silent was unambiguous. (*Harris*, *supra*, 211 Cal.App.3d at p. 649.) The interrogating officer subjectively understood Harris had invoked his right to remain silent because he had terminated the interrogation and had Harris indicate "No" on a written admonition form. When the interrogating officer commented, " 'I thought you were going to come back and straighten it out,' " it was the functional equivalent of further questioning. Thus, the trial court had erred in admitting Harris's post-*Miranda* confession. (*Ibid*.)

We do not read *Harris* to suggest that a response of, " 'Not really' " invariably means the accused has manifested a clear and unambiguous intent to invoke the right to remain silent. While the interrogating officer in *Harris* subjectively understood Harris's response to be a clear invocation of his right to remain silent (*Harris*, *supra*, 211

11.

Cal.App.3d at pp. 646, 649), our inquiry is objective. We must consider Thomas's response in the context to ascertain what a reasonable listener would have understood by Thomas's reply. (*Sanchez, supra,* 7 Cal.5th at p. 49.)

" 'In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that in context it would not be clear to the reasonable listener what the defendant intends.' " (*Sanchez, supra*, 7 Cal.5th at p. 49; see e.g., *Stitley*, *supra*, 35 Cal.4th at p. 535 [" 'I think it's about time for me to stop talking' " expressed frustration by the defendant but did not represent an attempt to end the interrogation]; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1006 [the defendant's statement—" 'I ain't talking no more and we can leave it at that' "—was not an unambiguous invocation of his right to remain silent; it was an expression of momentary frustration]; *People v. Martinez* (2010) 47 Cal.4th 911 [" 'I don't want to talk anymore right now,' " and " 'That's all I can tell you,' " did not amount to an unequivocal invocation of the defendant's right to remain silent].)

By volunteering statements about the shooting, Thomas clearly waived the right to remain silent. Further, at no point during his interrogation did Thomas clearly and unambiguously assert his right to remain silent. As we have explained, Thomas's response of "[n]ot really," was insufficient to infer he was asserting his right to remain silent. We therefore conclude the trial court did not err in finding Thomas's post-*Miranda* statements were admissible.

Although the parties dispute whether the erroneous admission of Thomas's challenged statements were prejudicial, our conclusion that the trial court did not err obviates the need for us to address the issue of prejudice.

## **DISPOSITION**

The judgment of conviction is affirmed.